THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appelle, *v.* HENRY THOMPSON *et al.*, Defendants-Appellants.

(No. 54578;

First District—January 3, 1972.

Gerald W. Getty, Public Defender, of Chicago, (Harold A. Cowen, Ronald P. Katz and James J. Doherty, Assistant Public Defenders, of counsel,) for appellants.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle and Henry A. Hauser, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE LYONS delivered the opinion of the court:

The defendants, Henry Thompson, John Yancy and Franklin Thomas, were charged with murder and armed robbery in violation of Ill. Rev. Stat. 1967, ch. 38, pars. 9—1, 18—2. Following a trial by jury, defendants were found guilty as charged and were sentenced to the Illinois State Penitentiary for not less than 150 nor more than 299 years.

On appeal defendants raised the following issues:

1) Whether the police lawfully entered Defendant Thompson's apartment and whether the subsequent arrests and search were lawful;

2) Whether the trial judge erred by disallowing disclosure of a police informer's identity;

3) Whether the trial judge erred by overruling a defense objection to a question asked of Defendant Yancey by the prosecutor;

4) Whether the trial judge erred by denying a defense motion to suppress identification testimony;

5) Whether the sentences imposed upon defendants were excessive.

The facts may be briefly summarized. On July 18, 1968, the three defendants and another man, Jesse Martin, decided to rob the Waldshine Liquor Store, 1100 East 47th Street, Chicago. At approximately 3:00 P.M. the four men drove to an alleyway near the store and parked their auto. The robbery plan to which they had agreed for Yancey and Thompson to enter the store while Thomas acted as a lookout outside the door and Martin remained in the auto. Three employees, Harold Brenner, Mildred Nunn and Simon Garber, were working in the store when Yancey and Thompson entered. Thompson walked up to Mr. Brenner, who was working with Mildred Nunn in the drug section of the store, announced the hold-up and brandished a revolver. Thompson then took the money from a nearby cash register. While these events were occurring, Mr. Graber was serving customers on the other side of the store, in the liquor section, and he was unaware that a robbery was in progress. Yancey, in the meantime, had walked to a safe in the rear

of the store but had been unable to open it. Yancey then walked to a cash register in the liquor section and began removing money from it. Mr. Garber saw what Yancey was doing and pushed him away from the cash register, saying, "What are you doing here, get out of here." Mildred Nunn then shouted across to Mr. Garber and informed him that a hold-up was in progress. Thompson ran over to the other side of the store and pointed his gun at Mr. Garber. Garber raised his hands and Thompson then fatally shot him in the face. The defendants fled the scene and proceeded to Thompson's apartment at 4041 South Ellis Avenue. A short time later they were arrested at that location and the murder weapon was found hidden in the bathroom.

For their first contention on appeal, defendants challenge the legal validity of the entry by police into Defendant Thompson's apartment. Theorizing that the entry was unlawful, defendants also contend that everything which stemmed from the entry, *i.e.*, the arrest, the search and all related evidence and testimony, was tainted, unlawful or inadmissible. Hence it is necessary to examine the circumstances surrounding the entry by police into Defendant Thompson's apartment.

The evidence adduced during the hearing on defendants' pre-trial motion to suppress physical evidence established that Officer Raymond Galto, assigned to the 21st District Tactical Unit, arrived at work about 5:15 P.M. on the day in question and was briefed about the robbery and shooting in the Waldshine Liquor Store. About fifteen minutes later, he was approached by Officer Downey, a patrolman in the district, and was informed that a man who knew something about the murder had been brought into the station. Officer Downey indicated that he had been approached by this man on the street and, after learning that the man had information about the Waldshine matter, asked the man to accompany him to the station. Officer Galto, upon hearing this, immediately proceeded to speak with the person and, according to Officer Galto:

"[H]e told me he was at 47th and Greenwood at approximately 3:10 that afternoon, and across the street from the Waldshine liquor store on the southeast corner, and that he heard a gunshot or what he thought to be a gunshot and he observed two males running from the store. He stated as he got closser after the two men were running he looked and they ran on Greenwood and west into an alley, and at that point they jumped into a car, and he was able to [recognize] three of the occupants of that car. * * * He didn't know them by their real names, but he knew them by nicknames. He said, 'Hank, Bubbles and Jesse.' He knew where Hank lived. He stated to me that after he had seen what took place in front of the liquor store that he went down to 43rd Street, and he knew that Hank was one of the people.

So he went toward the apartment and he seen Hank and the other three gentlemen go up into the apartment, go up into the building." Officer Galto quickly assembled four other police officers and proceeded to 4041 South Ellis Avenue, a four-story building containing numerous kitchenette apartments. Two officers were assigned to cover the building exits and the others went in and spoke with the building manager. Officer Galto asked the manager whether there was anyone in the building known as "Hank." The manager indicated that he did have one tenant known as Hank in apartment 104. The manager also informed the officers that Hank's full name was Henry Thompson.

The officers moved to the door of Thompson's apartment and one, Officer Higgins, knocked on the door. The door opened, Officer Higgins stated, "I'm a police officer," and the three officers entered the apartment. There were six men, two women and a child in the apartment which apparently consisted of one room and a bath. There was hair strewn about the bed and floor and it appeared that two of the men [Thompson and Thomas] had just had their heads shaven. Officer Higgins directed the six men against one wall and quickly patted them for weapons. A brief search of the immediate area was made and Officer Higgins then asked for "Hank." Henry Thompson stepped forward and identified himself as Hank. Officer Higgins then explained why the police were there, informed the suspects that they were under arrest and advised them of the constitutional rights. Next, according to Officer Higgins' testimony:

"Henry Thompson was asked if there was any weapons in the apartment,—sort of generally to everybody in the room, also, if there was any weapons in the apartment—and he said 'No,' there were no weapons and 'If you want to you can look around.' At that time we proceeded to search that particular room, by looking under the mattress, under the bed, and various places like that. Well, at that time a young lady said she wanted to go to the station, if they had to go to the station, and she wanted to change into a much more presentable blouse. And Officer Kennedy told her it would be best 'If you change in the other room, the bathroom.' And at that time he told her, 'But, before you go in there,' he wanted to search the room. So Officer Kennedy went into the bathroom  *  *  *."

During his search of the bathroom, Officer Kennedy discovered a .32 caliber revolver, containing three live cartridges and one empty cartridge case, on the floor under the bathtub. The weapon was seized and inventoried. A short time later the suspects were transported to the 21st District Police Station.

■■ In our view, the circumstances surrounding the entry by police

into Defendant Thompson's apartment do not indicate any improper or illegal conduct by the police. The facts, which we have carefully examined, disclose that when the police arrived at the door of Thompson's apartment they had reasonable grounds to believe that a crime had been committed, that Thompson had participated in its commission and that Thompson was presently in the apartment. Considering, therefore, that the police had probable cause to arrest Thompson before their entry and that speed and surprise were obviously essential to the safe apprehension of the suspects, we think the entry without a warrant was valid under the exigencies of the situation. See *Warden v. Hayden* (1967), 387 U.S. 294; *People v. Johnson* (1970), 45 Ill.2d 283; *People v. Hall*, No. 54375 (Ill.App., filed Sept. 21, 1971).

Defendants argue, however, that much of the information upon which the police relied was provided by an unidentified informant whose reliability was not established in court. Concluding that the informant must therefore be viewed as unreliable, defendants contend that the information which he supplied could not validly serve as a basis for probable cause. In support of this theory, defendants have referred us to several prior decisions which generally involve professional informers of narcotics violations. Such decisions, however, have no application in the instant case.

■■ Here the evidence indicates quite clearly that no professional informer or "special employee" of the police was involved. Rather, the informant was an ordinary citizen on the street who heard what sounded like a shot and saw two men run from a store and hurriedly flee the scene in an auto which had been parked in a nearby alley. A short time later, presumably after learning that a shooting and robbery had occurred in the store, the citizen approached Officer Downey and related what he had seen and whom he had recognized. Officer Downey then accompanied the citizen to the police station where he spoke with Officer Galto of the Tactical Unit. At this point Officer Galto had already been briefed concerning the then-known facts of the occurrence and it may be safely assumed that much of the citizen's information squared with information which had been provided by the surviving victims of the occurrence. Under these circumstances, we think Officer Galto was duty bound to act as he did upon the new information and we are impressed by his reasonable efforts to corroborate the citizen's information through the building manager before entering Thompson's apartment. In any event, it is not necessary, as defendants seem to suggest, that all information which is given to law enforcement officials be supplied by professional informers. Reliable information, upon which the

police are legally entitled to act, may come from any citizen and, as stated by the court in *People v. Hester* (1968), 39 Ill.2d 489, 514:

> "[T]he usual requirement of prior reliability which must be met when police act upon 'tips' from professional informers does not apply to information supplied by ordinary citizens."

(See also *People v. Hoffman* (1970), 45 Ill.2d 221; In Re *Boykin* (1968), 39 Ill.2d 617; and *People v. Carter* (1969), 116 Ill.App.2d 62.) Accordingly, we hold that the entry by police into Defendant Thompson's apartment was lawful and proper under the circumstances. Having thus decided, we are constrained to uphold the validity of the subsequent arrests and search. The evidence clearly indicates that once the police had lawfully entered the apartment to make an authorized arrest, they acted neither unreasonably nor otherwise in derogation of defendants' constitutional rights. Indeed, we think the record reveals that the police acted in full accord with all legal requirements governing the validity of arrests, searches and seizures of evidence.

Defendants next contend that the trial court erred by disallowing disclosure of the identity of the citizen from whom Officer Galto received information. Relying upon several cases which preclude the prosecution from withholding material evidence from the defense and also upon *Roviaro v. United States,* 1957, 353 U.S. 53, the defendants argue that disclosure of the citizen's identity was required because the citizen was either a material witness or a participant in the offense. In our view, however, defendants' reliance is misplaced and their contention is without merit.

■■■ It is well established that the State may, under appropriate circumstances, withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with the enforcement of that law. The purpose of the privilege, as stated in *Roviaro,* is "the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officers and, by preserving their anonymity, encourages them to perform that obligation." (353 U.S. at 59). (See also *McCray v. Illinois* (1967), 386 U.S. 300; *People v. Mack* (1957), 12 Ill.2d 151; 8 Wigmore, Evidence § 2374 (McNaughton rev. 1961).) The *Roviaro* case also pointed out that the privilege is not absolute and must give way where required by fundamental fairness, *e.g.,* where disclosure of the identity is relevant and helpful to the defense of the accused, or is essential to a fair determination of a cause. Whether disclosure is required in any given case depends, according to *Roviaro,*

on the particular circumstances of the case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors. (353 U.S. at 62). Applying these standards to the case at bar, we believe that the nondisclosure was proper. The record in this case is barren of any showing or inference that the informer either participated in the crimes, witnessed their commission or was present when defendants were arrested. Rather, the evidence unequivocally indicates that the informer was merely a citizen on the street who heard what sounded like a shot and saw two men run from a store. Moreover, the question of the citizen's identity arose during a pre-trial hearing where probable cause and not the guilt or innocence of the defendants was at stake. (See *McCray v. Illinois* (1967), 386 U.S. 300, 311.) In addition, it appears that regardless of what the informer's testimony might have been, it would have had little relevancy in face of the independent evidence by which the crimes were proven. Under such circumstances, together with the facts which show that the informer neither participated in the crimes nor was present during their commission or during defendants' arrests, amplification or contradiction of the information which led the police to Defendant Thompson's apartment would have been of no assistance to the defense. We therefore see no unfairness to the defendants, or any basis for upsetting the public purpose upon which the informer's privilege is said to rest. See *People v. Durr* (1963), 28 Ill.2d 308; *People v. Mack* (1957), 12 Ill.2d 151; and *People v. Quinn*, No. 54087 (Ill.App., filed Nov. 1, 1971).

■■■ Defendants' third contention concerns the propriety of a trial court ruling on an objection made by the defense to a question asked of Defendant Yancey by the prosecution during cross-examination. The particular question to which a defense objection was overruled was the following:

Q. "Now, Mr. Yancey, we submit to you that it is a fact, is it not, that Mr. Martin has never induced you to use narcotic drugs, by virtue of the fact that you testified that you have no needle marks on your arm, is that correct?"

Defendants now contend that the question was too confusing and that the trial court committed reversible error by allowing the question and Yancey's affirmative answer to stand. We cannot agree with the defendants in this regard. As stated by our Supreme Court in *People v. Nugara* (1968), 39 Ill.2d 482, 487—8:

"As a general rule the latitude to be allowed in cross-examination of witnesses rests largely in the discretion of the trial court. Such cross-examination should be kept within fair and reasonable limits and it is

only in a case of clear abuse of such discretion resulting in manifest prejudice to the defendant that a reviewing court will interfere."

We have carefully examined the form and language of the question asked by the prosecutor and are of the opinion that the question, when framed within the context of Yancey's full testimony, was neither so confusing nor improper as to require our interference with the trial court's ruling. Moreover, it appears from the record that any confusion which might have arisen because of the question was adequately clarified during the course of Yancey's subsequent testimony. Any error, therefore, was clearly harmless and could not have influenced the jury in any way.

■■  For their fourth contention, defendants allege that the trial court erred by denying a defense motion to suppress identification testimony. In essence, defendants argue that the line-up procedures used by the police were so unfair as to taint the in-court identifications made by the two surviving victims of the occurrence. We find no evidence whatsoever to support defendants' theory. The record indicates that although Mildred Nunn, Harold Brenner and Detective Boyle (who conducted the line-up) were all available to testify at the motion to suppress hearing, the defendants elected to call only Mildred Nunn as a witness. Miss Nunn was extensively questioned by both the State and defense counsel. Nowhere in her testimony was there any indication whatsoever that the line-up, which was conducted about 7:00 P.M. on the day of the occurrence, was unfair, suggestive, conducive to mistaken identity or otherwise in derogation of defendants' constitutional rights. Indeed, the trial court carefully considered defendants' motion to suppress on a point by point basis and found it totally without merit. We fully concur with the court's findings in this regard. In addition, we note parenthetically that the in-court identifications made during trial by Mildred Nunn and Harold Brenner were clearly of sufficient independent origin to be sustained. See *People v. Finch* (1970), 47 Ill.2d 425; *People v. Cook* (1969), 113 Ill.App.2d 231.

■■  As their final contention defendants argue that the sentences imposed were excessive and they ask this court to significantly reduce them. It is well established, however, that where the punishment imposed is within the limits prescribed by the legislature, as is the case here, a reviewing court should not disturb the penalty unless it clearly appears that the penalty constitutes a great departure from the spirit or purpose of the law. (See *People v. Hampton* (1969), 44 Ill.2d 41; *People v. Taylor* (1965), 33 Ill.2d 417.) The case before us involves a brutal and senseless murder, committed during the course of another serious

felony. Each defendant has an extensive criminal record for numerous violations of both State and Federal laws. Each defendant has repeatedly demonstrated an unwillingness to live in conformity with societal obligations and responsibilities, and has obviously chosen instead to pursue a life of crime. Under such circumstances, we believe that the public's right to protection from recidivists must be of primary concern. Hence, we are not inclined to disturb the sound discretion exercised by the trial court in imposing sentence.

Accordingly, for the reasons we have given, the judgment of the trial court is affirmed.

Judgment affirmed.

GOLDBERG, P. J., and BURKE, J., concur.