STATE OF NORTH CAROLINA v. JIMMY LEE MARTIN

No. 472A84

(Filed 18 February 1986)

**1. Indictment and Warrant § 6.2— homicide—evidence sufficient for arrest warrant**

The facts presented to a magistrate were sufficient to support a determination of probable cause to arrest where an officer told the magistrate about the physical details of the crime and the identification of defendant as the perpetrator by an eyewitness who knew defendant. The omission of a prior inconsistent statement by the witness and the fact that the detective interrogating the witness did not believe the rest of his account was not material because the witness had earlier said that he did not know the identity of the perpetrator rather than naming some identifiable person and then changing his story to name defendant, and the detective's suspicions about the witness's

State v. Martin

involvement would not negate the witness's identification of defendant in light of the statement of one of the victims that the witness and another man had been present and that the other man had done the stabbing.

**2. Criminal Law § 75.1— delay of two hours in taking defendant before a magistrate—no error**

There was no unnecessary delay in taking defendant before a magistrate where defendant was arrested at about 3:15 a.m. and taken directly to the police station but was not taken before a magistrate until about 5:00 a.m. Defendant showed no prejudice in that there was no violation of a constitutional right in connection with the delay, the delay was less than two hours, and defendant failed to show that he would not otherwise have confessed. N.C.G.S. 15A-511(a), N.C.G.S. 15A-974.

**3. Criminal Law § 75.3— defendant confronted by statement of accomplice—confession admissible**

Defendant was not tricked into making a statement to officers in that he believed an accomplice had confessed even though the accomplice's testimony was exculpatory where the word confessed was suggested by defense counsel; the bulk of the testimony by police officers at the *voir dire* was that a detective had told defendant that an accomplice had made a statement that implicated defendant; and, considering the witness's differing accounts of what happened on the night in question, his admission to being present at the time his friend committed the offense, and the overall testimony of the witnesses at the *voir dire*, it cannot be said that defendant was tricked by the officers into making a statement.

**4. Criminal Law § 75.14— admission of defendant's statement—mental capacity to waive rights—no error**

The trial court did not err in a murder prosecution by refusing to suppress defendant's statement based on a lack of mental capacity to understand the statement and waiver of rights forms where the court found, based on competent evidence, that defendant verbally indicated that he understood his rights; that he was not intoxicated and was alert and responsive during questioning; that he responded rationally and understandingly to questions; and that he understood the statement and waiver of rights form.

**5. Criminal Law § 102.3— prosecutor's closing argument—failure of court to correct ex mero motu or to give supplemental instruction—no error**

The trial court did not err by failing to act *ex mero motu* in a murder prosecution to correct a prosecutor or to grant defendant's motion for a supplemental corrective instruction where, taken in context, the prosecutor in his closing argument was correctly telling the jurors the law on the use of character evidence and reminded them that their oath was to apply the law as it exists.

**6. Criminal Law § 126.3— motion to re-poll jury denied—juror wishing to change vote—no error**

The trial court did not err by denying defendant's motion to re-poll the jury where the clerk polled the jury at defendant's request and each juror

assented to the verdicts as read; the verdicts as read included a finding that defendant was guilty of murder on theories of premeditation and deliberation and also felony murder; the written verdict found defendant not guilty of felony murder; the clerk brought the discrepancy to the court's attention and the court inquired about which verdict was correct; the jury agreed that the written verdict was correct; defendant declined when the judge asked if he wanted the jury re-polled; the forelady of the jury approached the judge during the sentencing phase and said she wished to change her vote to guilty of second degree murder rather than first degree murder; and defendant moved to re-poll the jury. Defendant's request to re-poll the jury after the juror attempted to change her vote based on testimony presented during sentencing was an attempt to impeach the jury's verdict. N.C.G.S. 15A-1238 (1983).

**7. Criminal Law § 181.4— motion for appropriate relief—newly discovered evidence—dismissed**

Further proceedings in a murder prosecution were dismissed where defendant filed a motion for appropriate relief with the Supreme Court based on new evidence, the motion was remanded to the superior court for an evidentiary hearing, the superior court concluded that the new evidence was unbelievable and denied the motion, and no exceptions to those findings or to the judgment on the motion for appropriate relief were filed with the court.

Justice BILLINGS did not participate in the consideration or decision of this case.

APPEAL by defendant from judgments entered by *Freeman, J.,* at the 7 May 1984 Criminal Session of Superior Court, GUILFORD County, Greensboro Division. Defendant also filed with this Court a motion for appropriate relief seeking a new trial.

*Lacy H. Thornburg, Attorney General, by Ellen B. Scouten, Assistant Attorney General, for the State.*

*A. Wayland Cooke and H. Davis North, III, for defendant-appellant.*

FRYE, Justice.

Defendant was charged in separate bills of indictment, filed 20 February 1984, with first degree murder, armed robbery, conspiracy to commit armed robbery, assault with a deadly weapon with intent to kill inflicting serious injury, and conspiracy to commit first degree murder. A jury found defendant guilty of all charges except armed robbery and recommended a sentence of life imprisonment. The trial judge sentenced defendant to life imprisonment for the murder conviction followed by the presump-

tive sentences for the remaining convictions. Defendant appealed his conviction for first degree murder to this Court as a matter of right pursuant to N.C.G.S. § 7A-27(a). Defendant's motion to by-pass the Court of Appeals on the lesser offenses was granted 14 August 1984.

Defendant presents four issues for this Court's consideration:

1) whether his confession should have been suppressed;

2) whether the weapons discovered as the result of the confession should have been suppressed;

3) whether the trial judge should have limited the prosecutor's argument *ex mero motu*, or, alternatively, should have allowed defendant's request for a curative instruction; and

4) whether defendant had a right to re-poll the jury during the sentencing phase of the trial as to its verdict in the guilt or innocence phase.

We answer all four questions in the negative and find no error in defendant's trial.

Betty Foley Peeler was killed on the evening of 10 November 1983. At the time of her death, she suffered from a heart condition, had undergone a colostomy, and had been hospitalized on various occasions for different ailments. She lived with her eighty-three-year-old father, Thomas T. Foley, in his home on Lee Street in Greensboro.

At defendant's trial, Tom Foley[1] said that he and his daughter were at home watching television on the evening she was killed. Sometime before eight o'clock, Ms. Peeler went to answer a knock on the door and returned with two young men. Foley and his daughter knew one of the men, one Willie Mastin, but not the other. Mastin said that the two had run out of gas and asked to use the telephone. When he finished his call, he said, "They are on their way with the gas." Foley asked Mastin where he was working and Mastin replied that he didn't know. Foley then asked who Mastin's friend was, and Mastin again replied that he did not

---

1. It should be noted that Foley appears to have been somewhat hard of hearing. He died in January of 1985.

know. Mastin eventually said that they also needed some oil and would go to a store up the street to get some.

When Mastin and the stranger returned, Mastin asked if his friend could use the bathroom. Betty Peeler offered to show him where it was. She and the stranger left the room. Foley then saw the stranger grab Ms. Peeler and pull her into the bathroom. She screamed, and Foley tried to go to her assistance. Mastin tried to dissuade him by saying that the noise was only Foley's dog. Foley got up nevertheless and met his daughter's assailant in the doorway. The young man was holding a knife. He stabbed Foley through the jawbone, cutting his tongue, and struck him between the eyes. Foley fell backwards over a wood stove in a corner of the room. He got up, grabbed a stick of wood, and struck his attacker. Mastin and the stranger both ran away.

Foley checked his daughter's pulse but found none. He went next door and asked the neighbors to call the police. By the time Foley returned to his house, police and ambulance were already there. Willie Mastin ran up, and Foley heard him tell the police some story about chasing the man who had stabbed Foley's daughter.

Foley had to be hospitalized for his injuries. He lost three teeth and a considerable amount of blood, needed stitches, and had a sore mouth for several days.

He was unable to identify defendant at trial as Mastin's friend. He explained his inability by saying that the stranger had kept his head down and not said anything the entire time he was in Foley's house.

When the police arrived at Foley's residence, they found Ms. Peeler already dead. The autopsy later disclosed that she had been stabbed eight times, twice in her neck, twice in her back, twice in her chest, and once in her left wrist and her right hand. The hand and wrist injuries were "defense-type" injuries that were probably the result of holding her hands in front of her to protect herself. One of the neck injuries pierced the carotid artery. Of the back injuries, one went through a rib and punctured a lung. One of the chest injuries penetrated her breastbone and punctured the aorta. These last two injuries, according to testimony at trial, required the use of considerable force.

The police officers on the scene at Foley's house interviewed Willie Mastin upon his return. After hearing his account of the killing, they requested him to accompany them to the police station to talk to a detective. Mastin agreed. Detective Scott interviewed him there at about 10:00 or 11:00 p.m. Scott had spoken briefly to Foley at the hospital earlier that night, and Foley had told him that he did not know the name of his daughter's killer but that Willie Mastin had been there. Foley thought Mastin was "involved." The account of the killing Mastin gave Scott was essentially the same as the one that he had earlier given the officers at Foley's house. Mastin said that he had been hitchhiking home from work when he was picked up by a white man, with black hair and a mustache, driving a blue 1970 or 1971 Fiat. The Fiat had a cut in the covering of the passenger's seat. Mastin did not know the man, who introduced himself only as "James." The Fiat ran out of gas near the intersection of Lee and Tate Streets. The two men went to Foley's house, which was nearby, to call for gas. There was no answer at the place Mastin called. "James" then remembered that he had a gas can in his car. The two returned to the car, got the can, bought some gas, and filled the car. "James" suggested returning to Foley's. When they got there, he asked if he could use the bathroom. From this point on, Mastin's account was similar to the story Foley told at trial, except that Mastin added that when he left, he chased "James" down the nearby railroad tracks. He saw "James" throw something into some bushes, but was unable to catch him, and so returned to Foley's to see whether Foley and his daughter were badly hurt.

Detective Scott did not believe this account and said so. He continued to question Mastin. Mastin stuck to his story until about 2:50 a.m. when he modified it. His new account was substantially the same as his previous one, except that he admitted that he knew the other man. Instead of an unknown "James" who picked him up in a blue Fiat, Ms. Peeler's killer was a friend of his named Jimmy Martin who lived in the trailer park where Mastin lived.

Detective Scott still did not believe that Mastin was an innocent bystander, but he did believe the identification. Accordingly, he sent Officer Brown to obtain a warrant for defendant's arrest. Brown told the magistrate that there had been a killing in which

the victim was stabbed to death, and that a witness had named defendant as the perpetrator. The magistrate issued the warrant.

The officers sent to arrest defendant found him in the trailer next door to his home. They found no indications that defendant had been taking drugs or alcohol. The officers verbally gave defendant his *Miranda* rights and took him back to Detective Scott at the police station.

Detective Scott in turn read defendant a Statement of Rights form and a Waiver of Rights form, pausing after each right to ask if defendant understood. Defendant indicated each time that he did, except for once asking about the meaning of the word "subsequent." He signed the waiver form.

Scott told defendant that Mastin had implicated him in the killing. Defendant then confessed to stabbing Ms. Peeler. Detective Scott took the following statement from him:

On 11/10/83, Thursday afternoon, at about 4:30 P.M., I went over to Willie Mastin's trailer. We talked for a while and Willie said, "I know where we can get some money." He said, "It's worth going and getting." He then said, "you know Betty and Tom?" He said, "The plan is we go to the house," and he said, "we're going to stay for a few minutes, and this is what I want you to do. I want you to ask Betty to use the bathroom, and when she gets into the bathroom, hold her mouth and hit her in the back a couple of times with a knife." He said, "Then flush the toilet to let Tom know you used the bathroom. Shut the door behind, go to the living room and tell me (Willie) that Betty has something to show him." The plan was to leave the knife on the sink and Willie would get the knife and go back where Tom was and hit Tom with it, and he might need my help because he was big. After we stabbed Tom we were to cut out the porch light and living room light, leave the TV on, and get the money. We were to leave out the back door, and we were going to go down the tracks and use the phone to call a cab and then go home. The plan was to kill both Tom and Betty and not have any witnesses. At the trailer park, Willie showed me the knife. It belonged to him. It was a lock blade type and Willie carried it to the house where Betty and Tom lived. We left the trailer park sometime after 5 P.M., walking up to Patter-

son Avenue (Patton Avenue) to the railroad tracks and walked the tracks to Goodwill on Eugene Street and onto Lee Street. We got to the house, Tom and Betty's, and saw two girls walking. We crossed the street so no one would see us go in. We waited and as they passed Willie knocked on the door. Betty came to the door and she said, "Come on in," because she knew Willie. He introduced me to Tom and Betty and we talked and watched TV for about 30 minutes. Willie got up and said, "We're going to the store and we will be back in a few minutes." We went in and I got a pack of cigarettes, Winstons. We went around the store and talked for a few minutes about the plan, and I told him I did not want to do it, that I was afraid and I did not want to kill anyone; but he said, "Come on, man, it's easy and no one will know that we done it if we don't leave any witnesses." We went back, sat down for a few minutes, left again and told them we were going outside to the store and buy some oil for a car that needed some oil. We went back to the Ma-Jik market but did not buy anything.

Willie asked if I was ready, and I said, "No," and he said this was our only chance. We went back in, sat down and talked for a few minutes, and that's when I got up enough nerve to ask Betty to use the bathroom, and she said, "I'll show you where it's at." I followed Betty to the bathroom. She opened the door, reached for the light, that's when I grabbed her from behind, put my hand over her mouth, and stabbed her two times with a knife that I had in my right hand. She hollered, "Tom," two or three times, and Tom and Willie came in. I pushed Tom out of the way into the stove, and Willie and me ran out the front door, down Lee Street, to the railroad tracks. Willie said, "Throw the knife down." I threw it into some bushes. Willie said, "Let's go back," cause he wanted to see where Tom was because he could identify us, and he also said he thought Betty was dead. He told me to wait 30 or 45 minutes and if he didn't return, to go home. He didn't come back, and I ran home. I have not seen Willie since.

Detective Scott testified that he took this statement from defendant word for word, except for very minor points such as adding "p.m." to times and inserting "Patton Avenue" in parentheses.

As a result of defendant's statement, the police discovered two knives that defendant identified as the ones Willie Mastin gave him. One was the murder weapon.

Defendant moved to suppress both the statement and the knives. The trial judge held a *voir dire* on the motion to suppress the statement. The various police officers involved in the investigation of Ms. Peeler's killing testified to their activities as previously described. Defendant's evidence tended to show that he was mentally retarded, with an I.Q. of 66, was easily led, functioned on a twelve-year, eight-month-old level, comprehended oral statements on a second grade level, and read on a third grade level. He completed very little of the ninth grade. All three of defendant's expert witnesses stated in essence that in their opinions, defendant was not capable of making the statement attributed to him in the form in which was written. Nor did these experts believe that defendant understood the Statement and Waiver of Rights forms at an adult level or that he could understand the consequences of his waiver. The trial judge, after making findings of fact and conclusions of law, denied defendant's motions.

I.

Defendant primarily assigns as error the trial judge's denial of his motion to suppress the statement taken by Detective Scott. He advances four arguments to support this assignment.

[1] First, he contends that there was no probable cause to support issuance of a warrant.

Determinations of probable cause have often been the subject of comment by this Court. In *State v. Harvey*, 281 N.C. 1, 187 S.E. 2d 706 (1972), Justice Branch, now Chief Justice, speaking for the Court, stated:

The Fourth Amendment requirement that no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the persons or things to be seized, applies to arrest warrants as well as to search warrants. The judicial officer issuing such warrant must be supplied with sufficient information to support an independent judgment that there is probable cause for issuing the arrest

warrant. The same probable cause standards under the Fourth and Fourteenth Amendments apply to both federal and state warrants.

281 N.C. at 6, 187 S.E. 2d at 710 (citations omitted). The standard applied to determinations of probable cause is not a technical one. As the Court said recently in *State v. Zuniga,* 312 N.C. 251, 322 S.E. 2d 140 (1984), "Probable cause is a flexible, common-sense standard. It does not demand any showing that such a belief be correct or more likely true than false. A practical, nontechnical probability is all that is required." 312 N.C. at 262, 322 S.E. 2d at 146. At minimum, a supporting affidavit for an arrest warrant must show enough for a reasonable person to conclude that an offense has been committed and that the person to be arrested was the perpetrator. *State v. Sturdivant,* 304 N.C. 293, 283 S.E. 2d 719 (1981). Moreover, as the United States Supreme Court reminded the legal community in *Massachusetts v. Upton,* 466 U.S. 727, 80 L.Ed. 2d 721 (1984), an appellate court reviewing the decision of a magistrate to issue a warrant does not decide the question of probable cause *de novo*; rather, the question for the appellate court's consideration is whether the evidence viewed as a whole provided a sufficient basis for the magistrate's finding.

In light of the considerations outlined above, a review of the evidence reveals that the facts presented to the magistrate were sufficient to support a determination of probable cause to arrest defendant. Officer Brown testified in essence that he told the magistrate about the physical details of the crime and the identification of defendant as the perpetrator by Willie Mastin, an eyewitness who knew defendant.

Defendant attacks only the sufficiency of Mastin's statement to support a finding that defendant was the perpetrator. He notes that no other evidence connected him with the crime; that Foley did not know him; and that he had no criminal record of any kind. Defendant argues that Mastin's credibility was therefore crucial and the magistrate had insufficient information to judge it, since the magistrate was not told that Mastin had made a prior inconsistent statement or that Detective Scott disbelieved the rest of his account. While these items might have been more properly mentioned than omitted, neither omission was material in this case. First, Mastin had earlier said that he did not know the iden-

tity of the perpetrator; he had not named some other identifiable person and then changed his story to name defendant. His earlier story is consistent with a normal desire not to squeal on a buddy. Second, Detective Scott's suspicions about Mastin's own involvement would not negate Mastin's identification of defendant in light of Tom Foley's statement that Mastin and another man had been present and that the other man had actually done the stabbing. Therefore, in this instance, Detective Scott's disbelief in the rest of Mastin's story is not material to a finding of probable cause to believe that defendant was the actual perpetrator.

Defendant urges, nevertheless, that the standards applicable to determining the reliability of paid police informers should apply to Mastin's statement. We reject this contention. Mastin was not a paid police informant. Had he been telling the whole truth, and Officer Scott incorrect in his beliefs, Mastin would have been an ordinary eyewitness. Several jurisdictions, acting on implied approval from the United States Supreme Court in *Chambers v. Maroney*, 399 U.S. 42, 26 L.Ed. 2d 419 (1970), *see* W. Lafave and J. Israel, *Criminal Procedure*, § 3.3(d) (1984), have declined to apply the same standards used for paid police informants to information obtained from witnesses and victims. *See, e.g., United States v. Rollins*, 522 F. 2d 160 (2nd Cir. 1975), *cert. denied*, 424 U.S. 918, 47 L.Ed. 2d 324 (1976); *United States v. Bell*, 457 F. 2d 1231 (5th Cir. 1972); *People v. Thompson*, 3 Ill. App. 3d 470, 278 N.E. 2d 462 (1972); *Saunders v. Commonwealth*, 218 Va. 294, 237 S.E. 2d 150 (1977). North Carolina has previously accepted a victim's description as sufficient identification to establish probable cause. *See State v. Sturdivant*, 304 N.C. 293, 283 S.E. 2d 719. In fact, Detective Scott's suspicions were valid. The result is the same; our Court of Appeals has held that identification by a codefendant is a sufficient identification to establish probable cause. *See State v. Freeman*, 31 N.C. App. 335, 229 S.E. 2d 238 (1976).

Defendant argues further that the arrest warrant was defective because it was not based upon a truthful showing under the rules of *Franks v. Delaware*, 438 U.S. 154, 57 L.Ed. 2d 667 (1978). In *Franks*, the United States Supreme Court said:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the af-

fiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at the hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Id.* at 155-56, 57 L.Ed. 2d at 672.

The misconduct relied upon by defendant is not that of Officer Brown who actually obtained the arrest warrant, but of Detective Scott. Defendant alleged that Detective Scott "knowingly and intentionally or with reckless disregard for the truth" presented the magistrate, through Officer Brown, false information in that he deliberately omitted material facts from the information he gave Officer Brown by not telling him he disbelieved Mastin's story.

Defendant had his hearing as mandated by *Franks.* The trial judge conducted a *voir dire* on defendant's motion to suppress, wherein defendant raised these issues, and after making findings of fact substantially similar to the facts described herein, concluded that probable cause had existed. The trial judge was correct in reaching this conclusion. Defendant completely failed to support his allegation of misconduct on the part of Detective Scott because, as discussed previously in this opinion, Scott's failure to tell Officer Brown about his disbelief in the remainder of Mastin's story was not material in this instance.

[2] Defendant's second argument for suppressing the statement taken by Detective Scott is that he was not taken before a magistrate without "unnecessary delay." N.C.G.S. § 15A-511(a) requires that a police officer take an arrested person to a magistrate without unnecessary delay. N.C.G.S. § 15A-511(a) (1984). Defendant was arrested at about 3:15 a.m. and taken directly to the police station. He was not taken before a magistrate until about 5:00 a.m. Defendant argues that this delay was unnecessary, due to the proximity of the magistrate's office to the police station. He

argues further that it was a substantial violation in that the delay was for the sole purpose of obtaining a confession. N.C.G.S. § 15A-974 provides that, upon a timely motion, evidence obtained as the result of a substantial violation of a provision of Chapter 15A must be suppressed. N.C.G.S. § 15A-974 (1984). Defendant contends that since his motion was timely, his confession therefore should have been suppressed.

We do not agree with defendant's contention. N.C.G.S. § 15A-511 does not prescribe mandatory procedures affecting the validity of a trial. *State v. Reynolds*, 298 N.C. 380, 259 S.E. 2d 843 (1979), *cert. denied*, 446 U.S. 941, 64 L.Ed. 2d 795 (1980). For a violation to be substantial, defendant must show that the delay in some way prejudiced him, for example, by causing a violation of his constitutional rights, *id.*, or by resulting in a confession that would not have been obtained but for the delay, *State v. Hunter*, 305 N.C. 106, 286 S.E. 2d 535 (1981). Defendant here has shown no prejudice. He alleges no violation of a constitutional right in connection with the delay. The delay itself was less than two hours, and this Court has previously declined to find a four and one-half hour delay inherently unreasonable. *See State v. Richardson*, 295 N.C. 309, 245 S.E. 2d 754 (1978). More importantly, defendant has failed to show that he would not otherwise have confessed.

[3] Defendant's third argument for suppressing the statement taken by Detective Scott is that he was tricked into making it. Defendant's contention that he was tricked into confessing is based on the following exchange which occurred upon cross-examination by defense counsel of Officer Poole who was present when Detective Scott interrogated defendant:

Q. And was he told that Mr. Mastin had implicated him?

A. Yes, sir, he was.

Q. All right. Was he told that Mr. Mastin had confessed and implicated him in the crime?

A. Yes, sir.

Q. Okay. And what did he say when—did you tell him or did Mr. Scott tell him Mr. Mastin confessed?

A. Detective Scott.

Q. And when Detective Scott told him that Mr. Mastin had confessed, what did Mr. Martin say?

A. First he began to cry; and then he stated, "Yes, I will tell you all about it."

Based upon this exchange alone, defendant now argues that he was tricked into believing that Willie Mastin had confessed when in fact Mastin's second statement was largely exculpatory.

There is no merit in this argument. We first note that the bulk of the testimony given by police officers at the *voir dire* was basically that Detective Scott told defendant that Willie Mastin had made a statement that implicated defendant. Defendant then began to cry and confessed forthwith. The only evidence that Officer Scott told defendant that Mastin had "confessed" was the testimony of Officer Poole on cross-examination as indicated above. The word "confessed" was suggested by defense counsel rather than by either witness. Whether Officer Scott told defendant that Mastin had "implicated" defendant or had "confessed and implicated" defendant cannot be determined from the record. The trial judge simply found that defendant "was not threatened, intimidated or coerced . . . ." We are not convinced that Officer Poole meant to say that defendant was told Mastin had made a full confession; rather, he was responding to the sense of defense counsel's question and affirming that defendant was told Mastin had implicated him. Considering Mastin's differing accounts of what happened on the night in question, his admission to being present at the time his friend committed the offense, and the overall testimony of the witnesses at *voir dire*, we are unable to say that defendant was tricked by the officers into making a statement.

[4] Finally, defendant argues that the statement obtained by Detective Scott should have been suppressed because defendant had not voluntarily, knowingly, and intelligently waived his Fifth Amendment rights against self-incrimination. Defendant's argument here is essentially that his waiver was not knowing and intelligent due to his incapacity to understand the Statement and Waiver of Rights forms.

A subnormal mentality, standing alone, will not render a confession incompetent if it is in all other respects voluntarily and

understandingly made. If a person has the mental capacity to testify and to understand the meaning and effect of statements made by him, he possesses sufficient mentality to confess. Nevertheless, lack of mental capacity is a factor to consider in determining the involuntariness of a confession. *State v. Thompson*, 287 N.C. 303, 318-19, 214 S.E. 2d 742, 752 (1975), *death sentence vacated*, 428 U.S. 908, 49 L.Ed. 2d 1213 (1976); *cf. State v. Fincher*, 309 N.C. 1, 305 S.E. 2d 685 (1983) (capacity to consent to search).

While defendant's evidence tended to show that he was unlikely to have understood the *Miranda* warnings given him, the State presented evidence from which the trial judge could have concluded otherwise. "When the *voir dire* evidence is conflicting . . . the trial judge must weigh the credibility of the witnesses, resolve the crucial conflicts and make appropriate findings of fact. When supported by competent evidence, his findings are conclusive on appeal." *State v. Jenkins*, 300 N.C. 578, 584, 268 S.E. 2d 458, 463 (1980). Here, the trial judge found that defendant verbally indicated that he understood his rights, that he was not intoxicated and was alert and responsive during questioning, that he responded rationally and understandingly to questions, and that he understood the Statement and Waiver of Rights forms. These findings were based upon competent evidence. The police officers testified that defendant appeared alert and that there were no signs that he was drunk or drugged. Detective Scott read the Statement and Waiver of Rights forms slowly, pausing after each right to ask whether defendant understood. Defendant repeatedly replied that he did. Finally, there was evidence that defendant had the capacity to ask for enlightenment when he did not understand: he asked the meaning of the word, "subsequent." The trial judge's findings will therefore not be disturbed.

Defendant also argues in this context that the State failed to show that the statement taken by Detective Scott was accurate. Defendant's experts testified that he could not have made the statement attributed to him in the form in which it was written. While defendant strongly argues that Detective Scott's repeated assertion that he had taken the statement from defendant word-for-word is not very credible, nevertheless, there was no showing that the facts as disclosed were inaccurate.

For all of the above reasons, we find that the trial judge did not err in denying defendant's motion to suppress.

## II.

Defendant argues next that the knives discovered as a result of his confession should also have been suppressed. Since the trial judge did not err in denying the motion to suppress defendant's confession, there was no error in denying his motion to suppress the knives.

## III.

[5] For his third assignment of error, defendant argues that the prosecutor in his closing argument "violated the rules of fair debate and propriety" to defendant's prejudice to such an extent that the trial judge should have either acted *ex mero motu* to correct the prosecutor or granted defendant's motion for a supplemental corrective instruction. Defendant excepts to two portions of the prosecutor's argument. Early in his argument the prosecutor said:

> I will get to the point real quickly, real quickly. Ladies and gentlemen, for you to come back in this courtroom and find the Defendant guilty of second degree murder is going to violate the oath that you took on this Bible . . . .

Somewhat later, he said the following:

> But that would not be right; it would not be following your oath as jurors in this case if you took—I will tell you ladies and gentlemen the oath that you took is as important to our system as the oath I take as a prosecutor, the oath that the Judge takes as the Judge, and the oath that Mr. Cooke and Mr. North must take as attorneys in this State—and they are both good attorneys. The only problem I have with anything that's occurred by any attorney is the fact that Mr. North has asked you, because the boy is not a bad boy, to find him guilty of second degree murder, to ignore your duties, to find the evidence, to find the facts and apply those facts to the law, because if you do that duty, I would argue to you there is no way that you could find the Defendant guilty of second degree murder. There is no way that you can find from the evidence if you believed the confession for—And if you don't believe the confession, then it should be a not guilty. But if you believe that confession, there is no way, I would argue to

State v. Martin

you, that you can find that they didn't plan, did not have premeditation, or that it was committed or was not committed during the course of a robbery. So, I would ask you to abide by your oath.

Defendant made no objections at the time but after the jury had retired to deliberate, he requested a supplemental curative instruction. The trial judge denied this request. Defendant contends that both of the passages recited above were improper and prejudicial.

Taken in context, the prosecutor's remarks in his closing argument do not reveal any impropriety. Following the first passage to which defendant excepts, the prosecutor continued:

What Mr. North has asked you to do is to come in here and find somebody not guilty of first degree murder, because he has never done it before and because he runs errands for old people, which I commend him for.

But, ladies and gentlemen, the evidence of character is admissible in a criminal court as to decide whether or not that man did the acts that the State of North Carolina has accused him of; but his character in no way, absolutely none, will excuse first degree murder to second degree murder. Not guilty by way of character, not guilty by way of cooperation, that has no place in the laws of the State of North Carolina.

You took an oath; the judge will tell you the law, and all I'm asking is that you follow that law as you said you would.

Taken in context, then, the prosecutor was, correctly, telling the jurors the law on the use of character evidence and reminding them that their oaths were to apply the law as it exists. The prosecutor is entitled to argue relevant law. *State v. Covington*, 290 N.C. 313, 226 S.E. 2d 629 (1976); *State v. Monk*, 286 N.C. 509, 212 S.E. 2d 125 (1975).

An examination of the second passage to which defendant excepts reveals the same situation as the first. There, the prosecutor argued to the jurors that defendant's confession revealed premeditation and deliberation. Counsel has a right to argue reasonable inferences from the evidence. *State v. Britt*, 291 N.C. 528,

231 S.E. 2d 644 (1976). The prosecutor also repeated to the jury part of the law on the use of character evidence, telling the jurors in essence that if they found premeditation and deliberation they could not use defendant's hitherto blameless character to reduce his conviction to second degree murder.

Since there was no impropriety in the prosecutor's remarks, the trial judge therefore had no duty to censor the argument on his own motion and no duty to grant defendant's motion for a curative instruction.

## IV.

[6] Defendant argues lastly that the trial court erred in denying his request to repoll the jury.

After the jury returned its verdicts finding defendant guilty of first degree murder, assault with a deadly weapon with intent to kill inflicting serious injury, conspiracy to commit armed robbery and conspiracy to commit murder, defendant requested that the jury be polled. Accordingly, the clerk polled the jury. Each juror assented to the verdicts as read. As read, the verdicts included a finding that defendant was guilty of first degree murder on theories of premeditation and deliberation and also felony murder. During the next recess, however, the clerk noticed that the written verdicts found defendant not guilty of felony murder. The clerk brought this discrepancy to the judge's attention. The judge inquired of the jury when the recess was over which finding was correct, and the jury agreed that the written verdict was the correct one. The judge asked defendant if he wanted the jury repolled, and defendant declined. Later, during the penalty phase of the trial, the forelady of the jury approached the judge and told him that she wished to change her vote to find defendant guilty of second degree murder rather than first. Defendant moved to repoll the jury. The trial judge denied the motion.

Defendant argues that he was entitled to have the jury polled again under the provisions of N.C.G.S. § 15A-1238. This section provides as follows:

§ 15A-1238. Polling the jury.

Upon the motion of any party made after a verdict has been returned and before the jury has dispersed, the jury

must be polled. The judge may also upon his own motion require the polling of the jury. The poll may be conducted by the judge or by the clerk by asking each juror individually whether the verdict announced is his verdict. If upon the poll there is not unanimous concurrence, the jury must be directed to retire for further deliberations.

N.C.G.S. § 15A-1238 (1983). Defendant argues that the jury had not yet been "dispersed."

The statute on which defendant relies gives him a right to poll the jury. N.C.G.S. § 15A-1238 (1983). It does not give defendant a right to an unlimited number of polls. Defendant exercised his right once when the jury first returned its verdicts. The trial judge properly offered defendant a second opportunity to poll the jury after the discrepancy between the oral and written verdicts was discovered and clarified. Defendant declined and thereby waived any right to repoll the jury on account of the discrepancy. The event which occasioned defendant's request for a repolling was the attempt of the forelady to change her vote based on testimony presented at the sentencing phase of the trial. The trial judge correctly refused to allow her to do so; a juror may not impeach the verdict of the jury after it has been rendered and received in open court. *State v. Cherry,* 298 N.C. 86, 257 S.E. 2d 551 (1979), *cert. denied,* 446 U.S. 941, 64 L.Ed. 2d 796 (1980). A juror's dissent is effectual at polling but not afterwards. *State v. Webb,* 265 N.C. 546, 144 S.E. 2d 619 (1965). Defendant's request to repoll the jury amounted to an attempt to impeach the jury's verdict, and the trial judge properly denied it.

## V.

[7] On 4 April 1985, defendant filed with this Court a motion for appropriate relief seeking a new trial on the grounds that he had obtained additional evidence not previously obtainable which had a direct and material bearing upon his guilt or innocence. This new evidence was another statement by Mastin.

In a sworn affidavit, Mastin said that Tom Foley had tried to hire him to kill Betty Peeler for $3,000. Foley's reason was that he was tired of his daughter's ailments; he "wanted to put her out of misery [sic]." Mastin first tried to trick defendant into committing the murder. He said that he later changed his mind and de-

cided not to become involved. Nevertheless, he took defendant to Foley's house. When they left the first time, defendant told Mastin that he was not going to do it. Upon their return to Foley's, Mastin accordingly relayed their refusal. When defendant asked to use the bathroom, Foley himself stabbed his daughter. Defendant asked, "What's going on?" Foley told defendant that he, defendant, had stabbed Foley's daughter twice. Defendant ran out of the house. Mastin himself "cut" Foley when Foley came at him with a knife. Mastin then fled. When he caught up with defendant, defendant said that he did not remember anything and that he was scared. Mastin had gotten each of them some Quaaludes earlier that evening. Defendant said that he wished he had never taken the Quaaludes. He then ran off.

In his affidavit, Mastin said that he had told his sister this story while he was in jail and would take a lie detector test if asked.

This Court remanded defendant's motion for appropriate relief to the Superior Court, Guilford County, for an evidentiary hearing. The hearing was held 1 August 1985. After some preliminary findings, the presiding judge found as facts:

[A]fter the trial of the defendant, Jimmy Lee Martin, the said Arthur William Mastin did enter pleas of guilty to second degree murder and assault with a deadly weapon with intent to kill inflicting serious injury, and was sentenced to a substantial term of imprisonment; that upon being examined under oath and in open court, he stated orally and on his transcript of plea that he, the said Mastin, was guilty of those offenses and was satisfied with his attorneys and did freely, knowingly and voluntarily, of his own choice, enter the said pleas. That in the course of Mastin's trial preparation and trials, he at no time stated to his attorneys that Tom Foley had killed Betty Foley Peeler, nor that he had cut and stabbed Tom Foley in self defense; that the first time he made a statement to that effect was after he was confined to the Polk Youth Center with the defendant, Jimmy Lee Martin, when he first told a sister and later told the defendant Jimmy Lee Martin's attorneys; that in all pre-trial statements made by Arthur William Mastin, the defendant Jimmy Lee Martin was named as that person who stabbed Betty

Foley Peeler to death and he did thus describe the killing in each of his statements made to the investigating officers; that at all times the said Arthur William Mastin stated to his trial attorneys that the killing was done by Jimmy Lee Martin at a time while the said Mastin was in the livingroom [sic] with Tom Foley; that Tom Foley was a very elderly, ill and frail person who has since the trial passed away and is thus unable to testify.

The trial judge found in addition:

That the interview statement of Arthur William Mastin on November 12, 1983 and the interview statement of the said Mastin made on November 11, 1983 and the confession of the defendant, Jimmy Lee Martin, offered at trial are basically consistent with the testimony of Tom Foley offered at the trial and with each other, and fully support the conviction of the defendant Jimmy Lee Martin on each of the offenses and are totally inconsistent with the Affidavit and statement of Arthur William Mastin made on or about February 13, 1985 while incarcerated at the Polk Youth Center.

Based on these facts, the judge concluded that Mastin's most recent story was unbelievable and denied defendant's motion for a new trial. No exceptions to these findings or to the judgment on the motion for appropriate relief have been filed with this Court. Thus, further proceedings in this Court will be dismissed.

To summarize:

1) the trial judge did not err in denying defendant's motion to suppress the statement taken by Detective Scott;

2) consequently, there was no error in the denial of the motion to suppress the weapons recovered as a result of that statement;

3) the trial judge did not err in refusing to censor the prosecutor's closing argument because it was not improper; and

4) the trial judge properly denied defendant's request to re-poll the jury.

For the reasons discussed herein, we find no error in defendant's trial. Defendant's motion for appropriate relief will be dismissed.

No error.

Justice BILLINGS did not participate in the consideration or decision of this case.