CALABRIA, Judge.
 

 *835
 
 Jose Merlin Henriquez Portillo ("defendant") appeals from a judgment entered upon a jury verdict finding him guilty of first degree murder. Defendant contends the trial court committed reversible error by excluding certain evidence he offered at trial, and by failing to suppress two statements he made to police officers in the hospital. We conclude that defendant received a fair trial free from error.
 

 I. Background
 

 On the evening of 16 December 2009, Cirilo Avila ("Avila") drove a grocery truck to the Pepper Ridge apartment complex in Winston-Salem. He planned to sell produce and earn money to purchase Christmas presents for his family. Since the truck had been
 
 *825
 
 robbed on previous occasions, Avila was carrying a .380 caliber handgun for his protection. Later in the evening, officers from the Winston-Salem Police
 
 *836
 
 Department ("WSPD") responded to a shooting in Pepper Ridge's parking lot. Responding officers found Avila's lifeless body in the back of his truck, and a .380 handgun with an empty magazine lay in his hand. Avila had been shot four times; two .45 caliber shell casings were found inside the truck and two were found outside of it. A few feet away from the truck, defendant was lying on his back on the pavement. He had been shot in the lower back, was unconscious, and had no radial pulse when EMS arrived. Several feet away from where defendant lay in the parking lot, the police found a .45 handgun with a wooden grip that had been partially shattered. Witnesses at the scene reported that they heard several gunshots from what sounded like multiple guns. Another witness saw someone run away from the scene.
 

 Defendant was transported to the hospital by EMS and underwent immediate emergency surgery for injuries he sustained in his lower right back and his wrist. Defendant was then placed in the intensive care unit ("ICU"). While defendant was being treated, medical personnel turned his clothes, two gloves, a wallet, two .45 automatic pistol magazines, and other personal items over to police officers. Inside the wallet was an identification card with defendant's picture and the name Jose Carranza Massimo.
 

 On 17 December 2009, Detectives Bell and Flynn of the WSPD arrived at the hospital to speak with defendant. Defendant's nurse informed the officers that while defendant was taking pain medication, he was able to answer questions coherently. WSPD Detective Bowen told the attending doctor that defendant was a suspect in a homicide case and asked that his identity be restricted and that he not be allowed to receive visitors. The doctor was also informed that WSPD officers would stand guard over defendant while he remained in the hospital. Officers assigned to guard duty wore standard-issue police uniforms.
 

 Defendant's hospital bed was in a room with about ten other patients that formed a semicircle facing the nurse's station. His bed curtain was open and any officer standing guard was seated about ten feet behind him, out of defendant's sight. In accordance with a WSPD policy designed to protect victims, suspects, and witnesses, the officer on duty could enter and leave without being seen by the patient.
 

 When defendant was being interviewed, he was alert, spoke clearly, and did not appear to be impaired in any way. His answers matched the officers' questions and he appeared to be in "full control of his mental faculties while he was speaking with the officers." Sometime during the interview, to ensure privacy, the detectives closed the curtains around
 
 *837
 
 defendant's bed. However, aside from the monitors and machines that were attached to him, defendant was not physically restrained during the interview.
 

 Detective Bell interviewed defendant in Spanish. At the time of the interview, the officers knew defendant had been shot and had undergone surgery the previous night. They did not know whether defendant was the person who shot Avila or was simply someone who had been injured in the gunfire. However, the officers expressed their belief that defendant had intended to rob the grocery truck and defendant acknowledged this fact. He also provided detailed information in response to open-ended questions, such as the progression of events on the night of the shooting.
 

 Defendant responded to the questions as follows: the robbery was his roommate's idea; his roommate's name was Chundo, who had a red two-door Honda Civic; Chundo was wearing dark clothes and drove both of them to the apartment complex between 7 and 8 p.m.; Chundo gave defendant a black semiautomatic .45 caliber pistol as they walked up to the grocery truck; the worker was inside the truck as they approached the truck, but there were no customers around; defendant pointed the gun at the worker and Chundo demanded money from the victim; defendant did not say anything; the plan was that he and Chundo would divide the proceeds of the robbery evenly; the man in the truck pulled a gun out of his front right pant pocket and shot at defendant; defendant fired two shots; and defendant did not know where Chundo went and did not know if the
 
 *826
 
 victim said anything. Defendant provided this information twice: once during a twenty-minute conversation and again during a five to six-minute audio recording. The statement defendant gave the detectives "made complete sense with what [they] knew from the crime scene," and it later proved consistent with information they eventually received. Defendant was not arrested after giving his initial statement, as he was still admitted to the hospital and the WSPD needed to follow up on the information it had obtained.
 

 Later that same day, Detective D.C. Taylor obtained a warrant charging defendant with murder and attempted robbery with a dangerous weapon. On 20 December 2009, defendant was restrained in handcuffs while he was still at the hospital, but there was no further contact between defendant and Detective Bell until defendant was discharged on 23 December 2009.
 

 On 23 December, Detectives Bell and Taylor visited defendant in his hospital room. Defendant appeared alert and coherent. There were officers outside the room and defendant was still in handcuffs. The officers
 
 *838
 
 read defendant his
 
 Miranda
 
 rights orally in Spanish, and also provided a written copy in Spanish. Defendant, who did not appear to be impaired, acknowledged understanding his rights, which he waived both verbally and in writing.
 

 The same day, defendant was interviewed at the WSPD. The interview was videotaped and recorded in Spanish, and lasted under one hour. At the time of the interview, defendant did not seem impaired, and officers had been told that the medication defendant had been given would not affect his cognitive abilities. After defendant was
 
 Mirandized
 
 yet again, he confirmed that he understood his rights and affirmed that he had signed the form. Defendant again told the officers what happened, in detail. Initially, defendant gave them the same false name he had given before, Jose Carranza Massimo, but he eventually acknowledged his real name and admitted that the name on the identification in his wallet was not his own.
 

 When asked if he could remember what happened on the day of the shooting, defendant stated the robbery was Chundo's idea, and that he had only known Chundo for a few weeks. Defendant also maintained that: Chundo gave him a black .45 caliber handgun; defendant had two of Chundo's gun magazines in his pocket; defendant pointed the gun at the driver; the driver was a Mexican male he did not recognize and he did not think Chundo knew him; both defendant and Chundo told the driver to give them money; as defendant stood in front of the man in the truck with Chundo behind defendant, the driver of the truck took a gun out of his right front pant pocket and shot him; defendant was not sure how many times the victim shot at him but he was hit twice, in the hand and the torso; he did not see if Chundo took anything because he fell; and defendant shot once or twice at the man in the truck. The interview concluded at 1:37 p.m. and defendant was taken to the magistrate shortly thereafter.
 

 In August 2010, defendant was indicted on one count of first degree murder and one count of attempted robbery with a dangerous weapon. The State gave notice of its intent to seek the death penalty, and on its own motion, the court ordered that defendant be examined for capacity to proceed to trial. At a November 2012 hearing, the court concluded defendant possessed the capacity to proceed to trial under N.C. Gen.Stat. § 15A-1001(a). Counsel for defendant filed a motion asking the court to deem him mentally incompetent and barred from receiving the death penalty. In addition, defendant moved to suppress his 17 December 2009 statement to Detectives Bell and Flynn, as well as his 23 December 2009 statement to Detectives Bell and Taylor.
 

 *839
 
 During a pretrial evidentiary hearing, the court declared the case as non-capital. The court also entered a detailed written order on the suppression matters, concluding Portillo was not in custody when he gave his 17 December statement and that he made his statement knowingly and voluntarily. In addition, the court concluded Portillo was properly advised of his right to counsel on 23 December, and he voluntarily waived that right. Consequently, the trial court denied defendant's motion to suppress both statements. The court's conclusion as to defendant's
 
 *827
 
 17 December statement was based, in pertinent part, on the following findings of fact:
 

 41. The Court finds based on the evidence that the defendant entered Baptist Hospital of his own volition to have gunshot wounds treated. The wounds were not inflicted by any state agency; instead, the wounds were inflicted as a result of the defendant's participation in an attempted armed robbery. The defendant was transported to the hospital by EMS personnel and not by police officers. There were not any overt actions by police officers at the hospital that indicated the defendant was in custody.
 

 42. The Court finds that the objective circumstances of the interview would not have caused a reasonable person to believe that there was a restriction on his or her freedom of movement to indicate a formal arrest. First, the Court finds that the defendant was not under arrest and was not handcuffed at the time of the interview. The warrant for arrest had not been issued prior to the interview.
 

 43. Second, the Court finds that the defendant was not restrained in any manner. The layout of the intensive care unit at Baptist Hospital where the defendant was recovering at the time of the interview and the location of the uniformed officer present would not have caused a reasonable person to believe his or her freedom of movement was being restrained. The intensive care unit in the North Tower is an open area in which the patients do not have individual rooms. There were not any locked doors or any evidence that a guard was behind the defendant at the time of the interview. There were no overt actions that indicated the defendant was in custody. Therefore, "the atmosphere and physical surroundings during the questioning manifest a lack of restraint or compulsion."
 
 State v. Thomas,
 

 22 N.C.App. 206
 
 , 211 [
 
 206 S.E.2d 390
 
 ] (1974).
 

 *840
 
 44. Third, the Court notes that Detective Bell and Detective Flynn were wearing plain clothes at the time of the interview with the defendant. This fact, as noted in [
 
 State v.] Waring,
 
 [
 
 364 N.C. 443
 
 , 471,
 
 701 S.E.2d 615
 
 , 633 (2010) ], dictates that a subject is not in custody. Therefore, the totality of the circumstances in the interview supports a finding that the defendant was not in custody.
 

 Defendant was tried in July 2013 in Forsyth County Superior Court. On 31 July 2013, the jury returned verdicts finding defendant guilty of first degree murder and attempted robbery with a dangerous weapon. After the trial court arrested judgment on the attempted robbery charge, defendant was sentenced to life imprisonment on the murder conviction. Defendant appeals.
 

 II. Motion to Suppress
 

 Defendant argues the trial court erred in denying his motion to suppress his 17 December and 23 December 2009 statements he gave to investigating officers. Specifically, defendant contends that he should have been advised of his
 
 Miranda
 
 rights since he was in custody when he made his 17 December statement. In addition, defendant argues his 23 December statement was tainted by the illegality of his 17 December statement and should have been excluded.
 

 A. Defendant's 17 December Statement
 

 Defendant first contends that his 17 December statement was inadmissible at trial because it was elicited during a custodial interrogation and because he was not
 
 Mirandized
 
 prior to making it. For these reasons, defendant argues the trial court committed reversible error by admitting his 17 December statement into evidence. We disagree.
 

 In reviewing a trial court's denial of a motion to suppress, "the trial court's findings of fact 'are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting.' "
 
 State v. Barden,
 

 356 N.C. 316
 
 , 332,
 
 572 S.E.2d 108
 
 , 120-21 (2002) (quoting
 
 State v. Eason,
 

 336 N.C. 730
 
 , 745,
 
 445 S.E.2d 917
 
 , 926 (1994) ). However, "the trial court's determination of whether an interrogation is conducted while a person is in custody involves reaching a conclusion of law, which is fully reviewable on appeal."
 
 State v. Buchanan,
 

 353 N.C. 332
 
 , 336,
 
 543 S.E.2d 823
 
 , 826 (2001) (citing
 
 State v. Greene,
 

 332 N.C. 565
 
 , 577,
 
 422 S.E.2d 730
 
 , 737 (1992) ). "The trial court's conclusions of law must be legally correct, reflecting a correct application of
 
 *828
 
 applicable legal principles to the facts found."
 
 Buchanan,
 

 353 N.C. at 336
 
 ,
 
 543 S.E.2d at 826
 
 (internal citation
 
 *841
 
 and quotation omitted). Since "defendant does not challenge the findings of fact on appeal, they are binding, and the only question before this Court is whether those findings support the trial court's conclusions."
 
 State v. Fuller,
 

 196 N.C.App. 412
 
 , 418,
 
 674 S.E.2d 824
 
 , 829 (2009) (citation omitted).
 

 The Fifth Amendment to the United States Constitution protects a person from being compelled to be a witness against himself in a criminal case. U.S. Const. amend. V. This privilege against self-incrimination "is made applicable to the states by the Fourteenth Amendment."
 
 State v. Richardson,
 

 226 N.C.App. 292
 
 , 299,
 
 741 S.E.2d 434
 
 , 440 (2013). In
 
 Miranda v. Arizona,
 
 the United States Supreme Court decreed that statements obtained from a suspect during a custodial police interrogation are presumed to be compelled in violation of the Fifth Amendment's Self-Incrimination Clause and are thus inadmissible in the State's case-in-chief.
 
 384 U.S. 436
 
 , 457-58,
 
 86 S.Ct. 1602
 
 , 1618-19,
 
 16 L.Ed.2d 694
 
 , 713-14 (1966). Under
 
 Miranda,
 
 "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."
 

 Id.
 

 at 444
 
 ,
 
 86 S.Ct. at 1612
 
 ,
 
 16 L.Ed.2d at 706
 
 . These safeguards include warning a criminal suspect being questioned that he "has the right to remain silent, that anything he says can be used against him in a court of law, [and] that he has the right to the presence of an attorney," either retained or appointed.
 

 Id.
 

 at 479
 
 ,
 
 86 S.Ct. at 1630
 
 ,
 
 16 L.Ed.2d at 726
 
 .
 

 Police officers, however, "are not required to administer
 
 Miranda
 
 warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because ... the questioned person is one whom the police suspect."
 
 Buchanan,
 

 353 N.C. at 337
 
 ,
 
 543 S.E.2d at 827
 
 (quoting
 
 Oregon v. Mathiason,
 

 429 U.S. 492
 
 , 495,
 
 97 S.Ct. 711
 
 , 714,
 
 50 L.Ed.2d 714
 
 , 719 (1977) ). Non-custodial interrogations do not require
 
 Miranda
 
 warnings.
 
 Id.
 
 at 337,
 
 543 S.E.2d 823
 
 ,
 
 543 S.E.2d at 826
 
 . Rather, "
 
 Miranda
 
 warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was
 
 that
 
 sort of coercive environment to which
 
 Miranda
 
 by its terms was made applicable, and to which it is limited."
 
 Id.
 
 at 337,
 
 543 S.E.2d at 827
 
 (citation omitted). Thus, when deciding whether
 
 Miranda
 
 warnings were required, a court must initially determine whether a defendant was "in custody" at the time of questioning.
 
 Id.
 
 at 337,
 
 543 S.E.2d at 826
 
 .
 

 To that end, our Supreme Court has held the definitive "inquiry in determining whether [an individual] is 'in custody' for purposes of
 
 Miranda
 
 is, based on the totality of the circumstances, whether there
 
 *842
 
 was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."
 
 Id.
 
 at 339,
 
 543 S.E.2d at 828
 
 (internal quotation marks omitted). This objective inquiry, labeled the " indicia of formal arrest test," is not synonymous with the "free to leave test," which courts use to determine whether a person has been seized for Fourth Amendment purposes.
 
 Id.
 
 at 339,
 
 543 S.E.2d at
 
 828 (citing
 
 United States v. Mendenhall,
 

 446 U.S. 544
 
 , 554,
 
 100 S.Ct. 1870
 
 , 1877,
 
 64 L.Ed.2d 497
 
 , 509 (1980) ). Instead, "the indicia of formal arrest test has been consistently applied to Fifth Amendment custodial inquiries and requires circumstances which go beyond those supporting a finding of temporary seizure and create an objectively reasonable belief that one is actually or ostensibly 'in custody.' "
 

 Id.
 

 (internal quotation marks and citation omitted).
 

 For purposes of
 
 Miranda
 
 , custody analysis must be holistic and contextual in nature: it is based on the totality of circumstances and is necessarily "dependent upon the unique facts surrounding each incriminating statement."
 
 State v. Garcia,
 

 358 N.C. 382
 
 , 399,
 
 597 S.E.2d 724
 
 , 738 (2004) (citing
 
 State v. Barden,
 

 356 N.C. 316
 
 , 337,
 
 572 S.E.2d 108
 
 , 123 (2002) ). "No one factor is determinative."
 
 Id.
 
 at 400,
 
 597 S.E.2d at 738
 
 . In addition, "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."
 

 *829
 

 Stansbury v. California,
 

 511 U.S. 318
 
 , 323,
 
 114 S.Ct. 1526
 
 , 1529,
 
 128 L.Ed.2d 293
 
 , 298 (1994). As such, the circumstances are examined from the interrogation subject's point of view.
 

 Id.
 

 at 324
 
 ,
 
 114 S.Ct. at 1529
 
 ,
 
 128 L.Ed.2d at 299
 
 ("[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.") (citation omitted). All told, custody analysis turns on "whether a reasonable person in [the suspect's] position would believe that they were under arrest or significantly restrained in their movement."
 
 State v. Allen,
 

 200 N.C.App. 709
 
 , 713,
 
 684 S.E.2d 526
 
 , 530 (2009).
 

 This Court has previously addressed whether a defendant is considered to be in custody while being treated at a hospital.
 
 E.g., Allen,
 

 State v. Fuller,
 

 166 N.C.App. 548
 
 ,
 
 603 S.E.2d 569
 
 (2004) ;
 
 State v. Thomas,
 

 22 N.C.App. 206
 
 ,
 
 206 S.E.2d 390
 
 (1974). The fact that a suspect is hospitalized at the time he is questioned by police does not, by itself, make an interview custodial.
 
 State v. Sweatt,
 

 333 N.C. 407
 
 , 417-18,
 
 427 S.E.2d 112
 
 , 118 (1993). Instead, all relevant factors must be balanced, including: "(1) whether the defendant was free to go at his pleasure; (2) whether the defendant was coherent in thought and speech, and not under the influence of drugs or alcohol; and (3) whether officers intended to arrest the defendant."
 
 Allen,
 

 200 N.C.App. at 714
 
 ,
 
 684 S.E.2d at 530
 
 (internal citation omitted).
 

 *843
 
 The
 
 Allen
 
 Court held that the hospitalized defendant was not in custody during an interrogation because any restraint in his movement was due to his medical treatment rather than any coercion or show of force by the police officers.
 
 Id.
 
 at 715,
 
 684 S.E.2d at 531
 
 . In
 
 Thomas,
 
 the trial court found that when the officers first addressed the defendant, they did not know what caused the accident that was the subject of the case, nor did they know the extent of defendant's involvement.
 
 22 N.C.App. at 209-10
 
 ,
 
 206 S.E.2d at 392-93
 
 . The officers also had no intention of arresting the defendant, who appeared coherent, articulate, and not under the influence of any narcotic drugs.
 
 Id.
 
 at 210,
 
 206 S.E.2d at 393
 
 . Further, the officers' placement in the room did not restrict the defendant's freedom of movement.
 

 Id.
 

 On appeal, this Court held that since the "atmosphere and physical surroundings during the questioning manifest[ed] a lack of restraint or compulsion[,]" a custodial interrogation had not occurred.
 
 Id.
 
 at 211,
 
 206 S.E.2d at 393
 
 .
 

 In the instant case, defendant's argument tracks the three factors articulated in
 
 Allen.
 
 Defendant first contends that "neither [his] grave medical condition nor the police presence would have allowed [him] to
 
 freely leave
 
 the ICU at the time Detectives Bell and Flynn arrived to question him." (Emphasis added). However, as noted above, this is not the proper inquiry. The dispositive issue is whether defendant's freedom of movement was restrained to the extent associated with a formal arrest.
 
 State v. Gaines,
 

 345 N.C. 647
 
 , 662,
 
 483 S.E.2d 396
 
 , 405 (1997) (citation omitted). Nothing in the record establishes defendant knew that a guard was present when the challenged interview was conducted. Defendant, who was interrogated in an open area of the ICU where other patients, nurses, and doctors were situated, had no legitimate reason to believe he was in police custody. Significantly, the trial court found that none of the officers on guard duty with defendant spoke "with [him] about the case ... prior to the [17 December] interview" and that Detectives Bell and Flynn wore plain clothes to the hospital. The court also found that "the objective circumstances of the interview would not have caused a reasonable person to believe that there was a restriction on his or her freedom of movement to indicate a formal arrest" because "defendant was not under arrest and was not handcuffed at the time of the interview." Even though the interrogating officers stood around defendant as he lay in a hospital bed, there is no evidence that defendant's movements were restricted by anything other than the injuries he had sustained and the medical equipment that was connected to him. Consequently, "[a]ny restraint in movement defendant may have experienced at the hospital was due to his medical treatment and not the actions of the police officers."
 
 Allen,
 

 200 N.C.App. at 715
 
 ,
 
 684 S.E.2d at 531
 
 .
 

 *844
 
 Furthermore, while it is true defendant would not have been permitted to leave the
 
 *830
 
 hospital on 17 December unless he obtained police clearance, this has no bearing on our custody analysis. Courts have repeatedly emphasized that a determination of custody depends on objective circumstances and not the undisclosed, subjective views of the interrogating officers.
 
 Buchanan,
 

 353 N.C. at 341
 
 ,
 
 543 S.E.2d at 829
 
 (internal citation omitted). "Unless they are communicated or otherwise manifested to the person being questioned, an officer's evolving but unarticulated suspicions do not affect the objective circumstances of an interrogation ... and thus cannot affect the
 
 Miranda
 
 custody inquiry."
 

 Id.
 

 (internal quotation marks and citation omitted).
 

 Second, defendant argues that the interrogation was custodial because he "was undoubtedly under the influence of the previous night's anesthesia and of pain medication" and "the detectives ... [did not] consult the attending physician as to the actual effect the drugs might be having on his comprehension." Yet nothing in the record indicates that defendant was incapable of understanding the questions he was asked. Although defendant had the ability to administer 1cc of morphine to himself at every ten minutes, he did not use any morphine between 12:45 and 4:55 p.m. on 17 December. When the investigating officers arrived at approximately 2:07 p.m., the ICU nurse specifically told Detective Flynn that the pain medication would not impair defendant's ability to answer questions. The record merely reveals the amount of morphine defendant could receive at one time, it does not establish the medication's effect on him. Indeed, the record suggests that any effect was minimal. Defendant was alert and coherent, and he spoke quietly, clearly, and deliberately. His statement "made complete sense with what [was] kn[own] from the crime scene," and it proved to be consistent with information that emerged later in the investigation. As a result, the record does not support defendant's argument that the medication had an adverse effect on his ability to think rationally, and the issue of impairment was one for the jury.
 

 Third, and finally, defendant argues that he was in custody because "the detectives arrived at the hospital with the intention of arresting him." This contention has no legal force here. Although the officers may have arrived at the hospital with the intention of arresting him, officers' plans, when not made known to a defendant, have no bearing on whether an interview is custodial.
 
 Id.
 
 at 341-42,
 
 543 S.E.2d at 829
 
 . Defendant's
 
 Miranda
 
 rights were not triggered simply because he had become the focus of the detectives' suspicions.
 
 See
 

 In re D.A.C.,
 

 225 N.C.App. 547
 
 , 553,
 
 741 S.E.2d 378
 
 , 382 (2013) (noting that "[a]bsent
 
 *845
 
 indicia of formal arrest, [the facts] that police have identified the person interviewed as a suspect and that the interview was designed to produce incriminating responses from the person are not relevant in assessing whether that person was in custody for
 
 Miranda
 
 purposes"). In any event, the warrant for defendant's arrest was not issued until after the 17 December interview was completed. Defendant fails to identify any evidence suggesting that he was aware of the detectives' knowledge and beliefs regarding the case at the time of questioning. Whatever degree of suspicion the detectives may have conveyed through their questioning, a reasonable person in defendant's position would not have been justified in believing he was the subject of a formal arrest or was restrained in his movement by police action.
 

 Reviewing the totality of the circumstances, we conclude that the evidence supports the trial court's findings, which in turn support its conclusion that defendant was not in custody when his 17 December statement was given. Because defendant was not in custody,
 
 Miranda
 
 warnings were not required, and the trial court did not err in admitting defendant's voluntary statement at trial. Accordingly, we reject defendant's argument.
 

 B. Defendant's 23 December Statement
 

 Defendant next contends that since his 17 December statement was taken in violation of
 
 Miranda
 
 and inadmissible, his 23 December statement was tainted and thus also inadmissible. We disagree.
 

 When a defendant's initial statement is taken in violation of
 
 Miranda
 
 , "a presumption arises which imputes the same prior influence to any subsequent confession, and
 
 *831
 
 this presumption must be overcome before the subsequent confession can be received in evidence."
 
 Greene,
 

 332 N.C. at 578-79
 
 ,
 
 422 S.E.2d at 738
 
 (citation omitted). The justification for this rule is a concern by courts that a second confession is so influenced by the first involuntary confession as to "deprive the defendant of his free will during subsequent confessions."
 
 Id.
 
 at 579,
 
 422 S.E.2d at 738
 
 (citation omitted).
 

 Defendant cites
 
 State v. Edwards,
 

 284 N.C. 76
 
 ,
 
 199 S.E.2d 459
 
 (1973) in support of his argument that his 23 December statement was inadmissible. In
 
 Edwards,
 
 our Supreme Court applied a rule from one of its much earlier cases,
 
 State v. Gibson,
 

 216 N.C. 535
 
 ,
 
 5 S.E.2d 717
 
 , 718 (1939), and determined that a defendant's later statement was inadmissible when it had been made after an earlier statement that was determined to be involuntary.
 
 Edwards,
 

 284 N.C. at 80
 
 ,
 
 199 S.E.2d at 461
 
 . The rule announced by the
 
 Gibson
 
 Court was as follows: "It is established by
 
 *846
 
 numerous decisions that where a confession has been obtained under such circumstances or by such methods as to render it involuntary, a presumption arises which imputes the same prior influence to any subsequent confession of the same or similar facts, and this presumption must be overcome before the subsequent confession can be received in evidence."
 
 Gibson,
 
 216 at 535,
 
 5 S.E.2d at 718
 
 .
 
 Gibson,
 
 however, was decided nearly three decades before
 
 Miranda
 
 .
 

 While it is true that
 
 Miranda's
 
 protections are such that no actual compulsion need be shown to result in the suppression of a statement obtained in violation of them, where no threats or coercion were used to extract an initial confession, "the reason for the rule giving rise to the presumption that subsequent confessions are tainted by the same influences that rendered the earlier confession [ ] involuntary does not exist."
 
 Greene,
 

 332 N.C. at 579
 
 ,
 
 422 S.E.2d at 738
 
 (quoting
 
 Siler,
 
 292 N.C. at 552, 234 S.E.2d at 739 ). "[T]he objective of
 
 Miranda
 
 is to protect against coerced confessions, not to suppress voluntary confessions, which 'are essential to society's compelling interest in finding, convicting, and punishing those who violate the law.' "
 
 Buchanan,
 

 353 N.C. at 342
 
 ,
 
 543 S.E.2d at 829
 
 (quoting
 
 Moran v. Burbine,
 

 475 U.S. 412
 
 , 426,
 
 106 S.Ct. 1135
 
 , 1143,
 
 89 L.Ed.2d 410
 
 , 424 (1986) ). Because no record evidence shows the 17 December statement was coerced, there is no support for defendant's contention that "[t]he [23 December statement] [was] thus tainted by the first." Moreover, the principle recognized in
 
 State v. Morrell
 
 resolves defendant's argument against him: "The Fifth Amendment requires suppression of a confession that is the fruit of an earlier statement obtained in violation of
 
 Miranda
 
 only when the earlier inadmissible statement is 'coerced or given under circumstances calculated to undermine the suspect's ability to exercise his or her free will.' "
 
 108 N.C.App. 465
 
 , 474,
 
 424 S.E.2d 147
 
 , 153 (1993) (quoting
 
 Oregon v. Elstad,
 

 470 U.S. 298
 
 , 309,
 
 105 S.Ct. 1285
 
 , 1293,
 
 84 L.Ed.2d 222
 
 , 232 (1985) ).
 

 In the instant case, we have already determined that defendant's 17 December statement was not given in the context of a custodial interrogation. Thus, his initial statement was not taken in violation of
 
 Miranda
 
 . Further, even assuming that the investigating officers were required to advise defendant of his
 
 Miranda
 
 rights on 17 December and failed to do so, such a violation would not require suppression of defendant's 23 December statement because his 17 December statement was neither coerced nor made under circumstances calculated to undermine his free will.
 
 See
 

 id.
 
 at 474,
 
 424 S.E.2d at 153
 
 . Accordingly, the trial court did not err in refusing to suppress defendant's 23 December statement.
 

 *847
 

 C. Trial Court's Refusal to Suppress Defendant's 23 December Statement on Grounds of Technical Statutory Violations
 

 Next, defendant argues that his 23 December statement was inadmissible under N.C. Gen.Stat. § 15A-974 and should have been suppressed by the trial court. According to defendant, the arresting police officers in this case committed substantial violations of our Criminal Procedure Act by failing to comply with N.C. Gen.Stat. §§ 15A-501 and 15A-511.
 

 Section 15A-974 provides, in relevant part, as follows:
 

 *832
 
 a) Upon timely motion, evidence must be suppressed if:
 

 (1) Its exclusion is required by the Constitution of the United States or the Constitution of the State of North Carolina; or
 

 (2) It is obtained as a result of a substantial violation of the provisions of this Chapter. In determining whether a violation is substantial, the court must consider all the circumstances, including:
 

 a. The importance of the particular interest violated;
 

 b. The extent of the deviation from lawful conduct;
 

 c. The extent to which the violation was willful;
 

 d. The extent to which exclusion will tend to deter future violations of this Chapter.
 

 N.C. Gen.Stat. § 15A-974(a) (2013). Section 15A-501 outlines the general duties of police officers upon arrest of a person, which include an officer's duty to "inform the person arrested of the charge against him or the cause for his arrest." N.C. Gen.Stat. § 15A-501(1) (2013). In addition, once a police officer makes an arrest with or without a warrant, the officer "must take the arrested person without unnecessary delay before a magistrate as provided in [ section] 15A-501." N.C. Gen.Stat. § 15A-511 (2013). Our Supreme Court has held that "[f]or a violation [of section 15A-511 ] to be substantial, [a] defendant must show that the delay in some way prejudiced him, for example, by causing a violation of his constitutional rights, ... or by resulting in a confession that would not have been obtained but for the delay [.]"
 
 State v. Martin,
 

 315 N.C. 667
 
 , 679,
 
 340 S.E.2d 326
 
 , 333 (1986) (citations omitted).
 

 Here, defendant was restrained in handcuffs while a patient in the hospital (20 December), but he was not taken before a magistrate until
 
 *848
 
 the day he was released from the hospital (23 December). Defendant was informed of the first degree murder charge against him after giving his 23 December statement. Defendant argues that, because the police obtained a warrant charging him with murder after his 17 December statement, he "had a fundamental right to know that formal criminal proceedings had been initiated against him before he was asked to make [another] statement on 23 December." Defendant also insists he was prejudiced by the delay in taking him before a magistrate. In its written order denying defendant's motion to suppress, the trial court conducted the following analysis after finding that the arresting officers committed "technical violation[s]" of sections 15A-501 and 15A-511 :
 

 The defendant was handcuffed on December 20, 2009 but was not taken before a magistrate until December 23, 2009. However, the Court finds that the defendant was not prejudiced by the technical violation. The defendant was still advised of his
 
 Miranda
 
 rights prior to the December 23, 2009 interview, and the defendant waived his rights. The defendant's waiver was voluntary for the same reasons cited previously.
 

 By his own admission, defendant cited violations of sections 15A-501 and 15A-511 in support of his motion to suppress at the trial level, while on appeal he argues that section 15A-974 "require[d] suppression" of his 23 December statement. Our appellate courts have "long held that where a theory argued on appeal was not raised before the trial court, 'the law does not permit parties to swap horses between courts in order to get a better mount [on appeal].' "
 
 State v. Sharpe,
 

 344 N.C. 190
 
 , 194,
 
 473 S.E.2d 3
 
 , 5 (1996) (quoting
 
 Weil v. Herring,
 

 207 N.C. 6
 
 , 10,
 
 175 S.E. 836
 
 , 838 (1934) ). For this reason, defendant has failed to properly preserve this issue for appellate review. Nevertheless, defendant contends we should review this issue, citing the following language in
 
 State v. Ashe
 
 : "When a trial court acts contrary to a statutory mandate and a defendant is prejudiced thereby, the right to appeal the court's action is preserved, notwithstanding defendant's failure to object at trial."
 
 314 N.C. 28
 
 , 39,
 
 331 S.E.2d 652
 
 , 659 (1985). This line of reasoning, however, is not persuasive here-defendant claims that police officers violated certain statutes governing arrest, not that the trial court acted contrary to a statutory mandate.
 

 Moreover, even assuming defendant's argument was properly before us, we
 
 *833
 
 find that it has no merit. Defendant claims he had a fundamental right to be informed of the pending charges before being questioned by law enforcement because "[w]ithout that knowledge, he could not
 
 *849
 
 knowingly and intelligently make a decision about the exercise of his rights." But no such principle of law exists. "A person does not have to know all the legal consequences of making a confession in order for the confession to be admitted into evidence."
 
 State v. Shytle,
 

 323 N.C. 684
 
 , 690,
 
 374 S.E.2d 573
 
 , 576 (1989) (citation omitted). And there is no requirement that an accused "be made aware of all facts which might influence his or her decision" to confess.
 

 Id.
 

 (citation omitted);
 
 Moran,
 

 475 U.S. at 422-23
 
 ,
 
 106 S.Ct. at 1141
 
 ,
 
 89 L.Ed.2d at 421-22
 
 ("[W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.... Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law."). Though additional information may have been useful to defendant or may have influenced his decision to confess, any violation of section 15A-501 was "technical" as opposed to substantial and did not render defendant's 23 December statement involuntary or inadmissible.
 
 See
 

 State v. Carter,
 

 296 N.C. 344
 
 , 352-53,
 
 250 S.E.2d 263
 
 , 268 (1979) ("We believe that
 
 Miranda
 
 not only lacks an explicit requirement that an individual be informed of the charges about which he is to be questioned prior to waiving his rights but also lacks any implicit requirement that such action be taken by authorities before a valid waiver of rights can be executed by one who is to be interrogated.... In the instant case the court specifically found that defendant was fully and accurately advised of his rights prior to answering any questions.... We also note that defendant had knowledge of his rights and was aware that the investigation concerned a homicide before he made the incriminating statement. Yet, he willingly continued to answer the questions put to him.").
 

 As for defendant's claim that he was prejudiced by the lapse of time between his arrest and his first appearance before a magistrate, the central issue is whether his confession resulted from the delay. Our Supreme Court has repeatedly held that when a defendant is interrogated before being taken before a magistrate, the confession that resulted was not obtained as a result of a substantial violation of Chapter 15A.
 
 See, e.g., Martin;
 

 State v. Allen,
 

 323 N.C. 208
 
 ,
 
 372 S.E.2d 855
 
 (1988),
 
 sentence vacated on other grounds,
 

 494 U.S. 1021
 
 ,
 
 110 S.Ct. 1463
 
 ,
 
 108 L.Ed.2d 601
 
 (1990) ;
 
 State v. Littlejohn,
 

 340 N.C. 750
 
 ,
 
 459 S.E.2d 629
 
 (1995). In
 
 Littlejohn,
 
 the defendant argued that, but for the thirteen-hour delay between his arrest and the time he was taken before a magistrate, he would not have confessed.
 
 340 N.C. at 758
 
 ,
 
 459 S.E.2d at 633
 
 . In rejecting this argument, our
 
 *850
 
 Supreme Court noted that the defendant had been advised of his rights before the interrogation and that he would have received the same notification from a magistrate.
 

 Id.
 

 at 758
 
 ,
 
 459 S.E.2d at 634
 
 . As a result, the defendant failed to establish that he "would have exercised his right to remain silent if he had been warned of this right by a magistrate rather than the officer."
 

 Id.
 

 Similarly, in the instant case, defendant was advised of his rights before being interviewed on 23 December regarding Avila's murder. Defendant has failed to show that the delay in appearing before a magistrate undermined his free will and rendered his confession involuntary. At first glance, the three-day period between defendant's arrest and his first appearance before a magistrate seems significant. However, since defendant was arrested while recuperating from gunshot wounds and taken before a magistrate on the same day he was released from the hospital, the actual "delay" at issue should be measured in hours not days. When the delay-which was largely due to defendant's medical treatment-is viewed in context, no substantial violation of section 15A-511 occurred.
 
 See
 

 id.
 

 at 758
 
 ,
 
 459 S.E.2d at
 
 633-34 ;
 
 State v. Chapman,
 

 343 N.C. 495
 
 , 499,
 
 471 S.E.2d 354
 
 , 356 (1996) (ten-hour delay between arrest and first appearance before a magistrate, where most of the time was
 
 *834
 
 spent questioning the defendant, did not constitute an unnecessary delay because officers had a right to conduct the interrogations). Accordingly, the trial court properly concluded that the inculpatory statements at issue did not result from substantial violations of Chapter 15A's provisions and the court did not err in denying defendant's motion to suppress his 23 December statement.
 

 III. Trial Court's Exclusion of Defendant's Purported Inconsistent Statement Made to Police
 

 In his final argument, defendant contends that the trial court erred by excluding a statement he made to Officer Charles Olivio,
 
 [1]
 
 a bilingual officer with the WSPD. Once again, we disagree.
 

 Officer Olivio had been posted to guard defendant on the morning of 19 December 2009. At some point, defendant offered an unsolicited statement to Officer Olivio, all in Spanish: "I am ... getting in trouble for nothing. My friend asked me to go with him. I stood around, and then I got shot. My friend ran. And now I can't feel my leg." At trial, defendant
 
 *851
 
 called Officer Olivio, who was examined outside the jury's presence. Because the State had placed great emphasis on the consistency between defendant's 17 and 23 December statements, defense counsel argued that defendant's "inconsistent statement" to Officer Olivio was admissible. After the State objected, the trial court ruled that the statement constituted "inadmissible self-serving hearsay of the defendant who has not testified...." Consequently, this evidence was not before the jury.
 

 On appeal, defendant argues that "the State opened the door to the admission of [his] statement to Officer Olivio by the prosecutor's repeated emphasis on the consistency of ... defendant's two recorded statements."
 

 When the State offers into evidence a part of a confession the accused may require the whole confession to be admitted. Thus, when the State introduces part of a statement made by a defendant, the defendant is then entitled to have everything brought out that was said by him at
 
 the time the statement was made
 
 to enable him to take whatever advantage the statement introduced may afford him. However, if the State does not introduce statements of a defendant made on a later date, a defendant is not entitled to introduce these later self-serving statements since the State has not opened the door for such testimony.
 

 State v. Weeks,
 

 322 N.C. 152
 
 , 167,
 
 367 S.E.2d 895
 
 , 904 (1988) (emphasis added) (citations omitted).
 

 Despite defendant's protestations on this issue, we need say little more than this argument has already been rejected by our Supreme Court.
 
 See
 

 id.
 
 at 168,
 
 367 S.E.2d at 905
 
 ("The evidence shows that [the defendant's purported exculpatory] statement was not made at the same time as the oral statements that were introduced into evidence. Therefore, in order for [the] defendant to be entitled to introduce this later self-serving statement, the State must have 'opened the door[,]' [which did not happen in this case.]");
 
 State v. Lovin,
 

 339 N.C. 695
 
 , 709-10,
 
 454 S.E.2d 229
 
 , 237 (1995) ("When the State elicited testimony from [the defendant's girlfriend] of a statement made by the defendant earlier in the day, it did not open the door for a statement the defendant later made from the jail to [her]. The statement did not corroborate [the] defendant's testimony because he did not testify. It would have been hearsay testimony and was properly excluded.").
 
 Weeks
 
 and
 
 Lovin
 
 require a defendant's exculpatory statement to have been made at the same time as other statements that have been introduced into evidence. Because defendant's self-serving, exculpatory statement to
 
 *852
 
 Officer Olivio was made on 19 December 2009, separate and apart from the statements he made on 17 and 23 December, the State did not open the door for its admission. Accordingly, the trial court properly excluded it at trial.
 

 IV. Conclusion
 

 We conclude that the evidence supports the findings entered in the trial court's suppression order, and those findings support
 
 *835
 
 the court's conclusions that defendant's 17 and 23 December statements were admissible. The trial court also did not err in concluding that technical statutory violations did not warrant the suppression of defendant's 23 December statement. Finally, the trial court properly excluded defendant's exculpatory statement to Officer Olivio.
 

 NO ERROR.
 

 Judges STROUD and INMAN concur.
 

 [1]
 

 We note that Officer Olivio's last name is also spelled as "Olivo" in the transcript. We use the former spelling of his name because that is how the court reporter transcribed it when he was introduced as witness and stated his title and full name.