STROUD, Judge.
 

 *526
 
 Defendant Devrie Leran Burris ("defendant") appeals from the trial court's judgment finding him guilty of impaired driving. On appeal, defendant raises several issues, including that the trial court erred in denying his motion to suppress self-incriminating statements made
 
 *527
 
 after his driver's license was retained and without
 
 Miranda
 
 warnings. Because we find that defendant was not in custody at the time his license was retained, we affirm the trial court's denial of his motion to suppress the statements. We also hold that the trial court properly denied defendant's motion to suppress the results of the warrantless blood draw due to exigent circumstances and that the court did not err in denying his motion to dismiss at the close of all the evidence.
 

 Facts
 

 On 13 April 2012, Christopher Hill of the Kannapolis Police Department ("Detective Hill") responded to a suspicious person call at a Fairfield Inn in Cabarrus County. After pulling in to the hotel parking lot, Detective Hill observed a red Ford Explorer "parked in front of the hotel kind of in the unloading area under the overhang." A woman was standing outside of the Explorer and defendant was sitting in the driver's seat. Detective Hill spoke to the woman standing outside of the car and to defendant through the passenger side window, which was rolled down. The vehicle's engine was not running.
 

 Detective Hill asked "what they were doing there" and "for their identifications." Defendant and the woman responded that they were trying to get a room, and defendant got out of the driver's seat to walk around the car to Detective Hill to hand him his identification. Detective Hill noticed a "strong odor of alcohol beverage" from defendant when he handed over his driver's license. He told defendant and the woman to "hang tight there in the parking lot area" while he went inside to talk to the hotel clerk. He learned that the clerk had called because of a concern that the actions of defendant and the woman were similar to "a robbery that happened in a neighboring hotel a night or two before."
 
 [1]
 

 Based on his conversation with the hotel clerk, Detective Hill went back outside to ask defendant if he was the one driving the vehicle, to which he responded "yes." He then began asking defendant questions about where he was traveling and the route he had taken to the hotel. At some point, Detective
 
 *455
 
 Hill checked the registration on the vehicle and determined that it was registered in defendant's name. Detective Hill asked defendant whether he had anything to drink that night, and defendant responded that he had "a couple drinks." Defendant told
 
 *528
 
 Detective Hill that he had not had anything to drink since arriving at the hotel. Detective Hill did not observe any open or unopened containers in or around the red Ford Explorer.
 

 Detective Hill asked defendant "to submit to field sobriety testing," and performed those tests in the parking lot. Defendant "showed some signs of impairment on them." Detective Hill then asked defendant to submit to a portable breath sample test, and he obliged, resulting in a reading of .10. At that point, Detective Hill placed defendant under arrest for driving while impaired and transported him to the Kannapolis Police Department.
 

 After arriving at the police station, Detective Hill attempted to perform a breath test on defendant, but he refused. Since defendant refused a breath test, Detective Hill took defendant to the hospital to request a blood draw for analysis. Detective Hill did not seek a warrant for the blood draw. After arriving at the hospital, Detective Hill informed defendant of his implied consent rights. Defendant exercised his right to contact a witness, but 30 minutes later, the witness still had not arrived. After defendant refused to submit to a blood draw, Detective Hill directed a nurse to draw blood samples from defendant's arm. After the blood draw, Detective Hill transported defendant to the magistrate's office, where he was processed and placed in jail.
 

 Defendant was charged with impaired driving. He was convicted and sentenced in district court on 15 April 2014. Defendant appealed to the superior court. Defendant filed a motion to dismiss on 23 July 2015, and in the motion asked for suppression of
 

 any statements made by Defendant as the officer engaged in a custodial interrogation of the Defendant without advising the Defendant of his right to refrain from answering any questions or advising the Defendant of his constitutional right to counsel during questioning or any other federal, state or statutory rights of an accused in police custody regarding the effect of any statement on future proceedings.
 

 On 17 August 2015, a hearing was held on defendant's motion and the trial court orally denied the motion to suppress statements in open court.
 

 Following the 17 August 2015 hearing, the trial court entered an order and a subsequent amended order denying defendant's motion. In the amended order, the court concluded in relevant part:
 

 *529
 
 2.
 
 Miranda
 
 warnings and a waiver of those rights apply only before officers begin a custodial interrogation.
 
 Miranda v. Arizona
 
 ,
 
 384 U.S. 436
 
 ,
 
 86 S.Ct. 1602
 
 . Without facts showing both "custody" and "interrogation," the
 
 Miranda
 
 rule is inapplicable.
 

 3. The U.S. Supreme Court has ruled that a person is in custody under the
 
 Miranda
 
 rule when officer [sic] have formally arrested the person or have restrained a person's movement to a degree associated with a formal arrest. Berkemer v. McCarty,
 
 468 U.S. 420
 
 ,
 
 104 S.Ct. 3138
 
 .
 

 4. The North Carolina Supreme Court has made clear that it follows the U.S. Supreme Court on the meaning of custody.
 
 State v. Buchanan
 
 , 353 [N.C.] 332,
 
 543 S.E.2d 823
 
 .
 

 5. In the present case, the Defendant falls short of the test for custody, therefore the statements made before arrest should not be suppressed.
 

 6. Under the totality of the above-referenced circumstances, the Defendant's Motion to Suppress should be denied.
 

 An additional order denying defendant's motion to suppress was entered regarding the warrantless blood draw, finding "exigent circumstances to support a warrantless blood draw." A jury trial was held from 5 October to 7 October 2015, with the jury finding defendant guilty of driving while impaired. Defendant timely appealed to this Court.
 

 *456
 

 Discussion
 

 On appeal, defendant argues (1) that his motion to suppress self-incriminating statements should have been granted because he was seized and in custody at the time the statements were made yet he received no
 
 Miranda
 
 warnings; (2) that his motion to suppress the blood draw should have been granted because the warrantless blood draw was completed outside of any exigent circumstances; and (3) that the trial court erred in denying his motion to dismiss the charges because there was insufficient evidence to support a conviction.
 

 I. Motion to Suppress Self-Incriminating Statements
 

 Defendant first argues on appeal that the trial court erred in denying his motion to suppress self-incriminating statements made without
 
 Miranda
 
 warnings. Specifically, defendant argues that he was seized and in custody when Detective Hill engaged in a "custodial interrogation"
 

 *530
 
 and that he was "entitled to
 
 Miranda
 
 warnings before [Detective] Hill's ensuing questions."
 

 The standard of review in evaluating the denial of a motion to suppress is whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law. However, when ... the trial court's findings of fact are not challenged on appeal, they are deemed to be supported by competent evidence and are binding on appeal. Conclusions of law are reviewed de novo and are subject to full review. Under a
 
 de novo
 
 review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal.
 

 State v. Biber
 
 ,
 
 365 N.C. 162
 
 , 167-68,
 
 712 S.E.2d 874
 
 , 878 (2011) (citations and quotation marks omitted).
 

 Defendant does not frame his argument as a challenge to any particular findings of fact but rather simply argues that he should have received
 
 Miranda
 
 warnings after his license was retained and before Detective Hill asked questions, because he was seized and under custodial interrogation at that time. Defendant's argument does, however, direct us to a portion of the findings of fact as unsupported by the evidence, so we will briefly address those relevant findings.
 

 The trial court found in part that:
 

 4. Detective Hill asked the Defendant and the female for identification. The Defendant got out of the vehicle and gave identification to Detective Hill.
 

 5. During this interaction, Detective Hill noticed that the Defendant had a strong odor of alcohol about his person
 
 and the Defendant admitted to driving
 
 .
 

 6. Detective Hill directed both subjects to remain where they were while he went into the hotel to speak with the desk clerk. Detective Hill could not specifically recall, but believes he retained possession of the Defendant's identification (driver's license) when he left to enter the hotel.
 

 (Emphasis added). Although the timing of events is not entirely clear from the wording of Finding No. 5, it could be understood to mean that defendant admitted to driving the vehicle
 
 before
 
 Detective Hill went
 
 *531
 
 inside the hotel to speak to the clerk. If that was the intended meaning-and it may not have been-it is not supported by the evidence. Detective Hill's testimony at the suppression hearing sets forth the correct order of events. At the hearing, Detective Hill testified on direct examination by the State:
 

 Q And what did you observe once you arrived on the scene?
 

 A. When I pulled into the parking lot, I observed a red Ford Explorer....
 

 Q What did you do at that point?
 

 A At that point I exited my patrol vehicle. I walked over to where the female was standing. I made contact with her, and the window was down in the passenger side so I was speaking to both her and the male and just asked what they were doing there and asked for their identifications.
 

 Q What was the nature of the conversation with the defendant?
 

 A At that point it was just when I asked what they were doing there, they said they were trying to get a room.
 

 Q And what happened next?
 

 *457
 
 A When I asked for the identifications ... [defendant] got out of the driver seat of the vehicle and walked around to me and handed me his identification as well.
 

 ....
 

 Q Did you make any observations about him at that time?
 

 A At that time when he walked around to me and while we were just engaging in some short conversation, I detected a strong odor of alcoholic beverage coming from him.
 

 ....
 

 Q What did you do at that point?
 

 A At that point I just asked him to kind of hang tight there in the parking lot area while I went inside to speak with the hotel clerk. I went inside, spoke with her.
 

 *532
 
 Q And what did you do based on that conversation?
 

 A Based on that conversation,
 
 I went back outside to speak to [defendant] and I asked him if he was the one who was driving the vehicle, and he responded to me yes
 
 .
 

 (Emphasis added). Detective Hill testified that it was not until after he went inside to speak to the hotel clerk and came back out that he asked defendant whether he had been driving. There is no evidence of any other order of events. Accordingly, we find that to the extent that Finding No. 5 could be understood as finding that Detective Hill asked defendant about driving
 
 before
 
 he took his driver's license and told him to "hang tight," the trial court's order contains findings that are not supported by competent evidence.
 

 Nevertheless, the crux of defendant's argument on appeal deals with the trial court's conclusion that defendant "falls short of the test for custody[.]" In
 
 Miranda v. Arizona
 
 , the United States Supreme Court held that statements stemming from a custodial interrogation of the defendant may not be used unless the prosecution "demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."
 
 384 U.S. 436
 
 , 444,
 
 86 S.Ct. 1602
 
 , 1612,
 
 16 L.Ed.2d 694
 
 , 706 (1966). Our Supreme Court has since clarified that "[t]he rule of
 
 Miranda
 
 requiring that suspects be informed of their constitutional rights before being questioned by police only applies to custodial interrogation."
 
 State v. Brooks
 
 ,
 
 337 N.C. 132
 
 , 143,
 
 446 S.E.2d 579
 
 , 586 (1994). Additionally, "our Supreme Court has held the definitive inquiry in determining whether an individual is in custody for purposes of
 
 Miranda
 
 is, based on the totality of the circumstances, whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."
 
 State v. Portillo
 
 , --- N.C. App. ----, ----,
 
 787 S.E.2d 822
 
 , 828,
 
 appeal dismissed
 
 , --- N.C. ----,
 
 792 S.E.2d 785
 
 (2016) (citation, quotation marks, and brackets omitted).
 

 Defendant argues that when Detective Hill retained his driver's license, he "was seized under the Fourth Amendment" and "was not 'free to leave[.]' " As such, defendant claims that "since [defendant] was seized, [Detective] Hill's ensuing questions constituted a custodial interrogation." Defendant's argument, however, erroneously conflates the
 
 Miranda
 
 standard for custody with seizure. Our Supreme Court clarified in
 
 State v. Buchanan
 
 ,
 
 353 N.C. 332
 
 , 339,
 
 543 S.E.2d 823
 
 , 828 (2001), that these two standards "are not synonymous[.]"
 

 In
 
 Buchanan
 
 , the defendant argued "that the concept of 'restraint on freedom of movement of the degree associated with a formal arrest'
 

 *533
 
 merely clarifies what is meant by a determination of whether a suspect was 'free to leave.' "
 
 Id
 
 . Our Supreme Court disagreed, explaining:
 

 The two standards are not synonymous, however, as is evidenced by the fact that the "free to leave" test has long been used for determining, under the Fourth Amendment, whether a person has been seized. Conversely, the indicia of formal arrest test has been consistently applied to Fifth Amendment custodial inquiries and requires circumstances which go beyond those supporting a finding of temporary seizure and create an objectively reasonable belief that one is actually or ostensibly "in custody." Circumstances supporting an objective showing that one is "in custody" might include a police officer standing
 
 *458
 
 guard at the door, locked doors or application of handcuffs.
 

 The trial court in the instant case mistakenly applied the broader "free to leave" test in determining whether defendant was "in custody" for the purposes of
 
 Miranda
 
 . We therefore remand the case to the trial court for a redetermination of whether a reasonable person in defendant's position, under the totality of the circumstances, would have believed that he was under arrest or was restrained in his movement to the degree associated with a formal arrest.
 

 The State contends this Court has been inconsistent in its application of the "ultimate inquiry" test versus the "free to leave" test. To the extent that [the cases cited] or other opinions of this Court or the Court of Appeals have stated or implied that the determination of whether a defendant is "in custody" for
 
 Miranda
 
 purposes is based on a standard other than the "ultimate inquiry" of whether there is a "formal arrest or restraint on freedom of movement of the degree associated with formal arrest," that language is disavowed.
 

 Id
 
 . at 339-40,
 
 543 S.E.2d at 828
 
 (citations omitted).
 
 See also
 

 Portillo
 
 , --- N.C.App. at ----,
 
 787 S.E.2d at 828
 
 ("This objective inquiry [for determining whether an individual is 'in custody' for
 
 Miranda
 
 purposes], labeled the 'indicia of formal arrest test,' is not synonymous with the 'free to leave test,' which courts use to determine whether a person has been seized for Fourth Amendment purposes. Instead, the indicia of formal arrest test has been consistently applied to Fifth Amendment custodial
 
 *534
 
 inquiries and requires circumstances which go beyond those supporting a finding of temporary seizure and create an objectively reasonable belief that one is actually or ostensibly 'in custody.' " (Citations and quotation marks omitted));
 
 State v. Little
 
 ,
 
 203 N.C.App. 684
 
 , 688,
 
 692 S.E.2d 451
 
 , 456 (2010) ("[O]ur Supreme Court has rejected the 'free to leave' test for
 
 Miranda
 
 purposes and specifically overruled [prior cases] to the extent they appear to endorse that test. Instead, the ultimate inquiry on appellate review is whether there were indicia of formal arrest." (Citations omitted)).
 

 In
 
 Berkemer v. McCarty
 
 ,
 
 468 U.S. 420
 
 , 442,
 
 104 S.Ct. 3138
 
 , 3151-52,
 
 82 L.Ed.2d 317
 
 , 336 (1984), the U.S. Supreme Court ruled that the defendant was not taken into custody for
 
 Miranda
 
 purposes until the police officer formally arrested him and transported him in his patrol car to the county jail, so
 
 Miranda
 
 warnings were not required until his arrest. The U.S. Supreme Court concluded:
 

 [W]e find nothing in the record that indicates that respondent should have been given
 
 Miranda
 
 warnings at any point prior to the time Trooper Williams placed him under arrest. For the reasons indicated above, we reject the contention that the initial stop of respondent's car, by itself, rendered him "in custody." And respondent has failed to demonstrate that, at any time between the initial stop and the arrest, he was subjected to restraints comparable to those associated with formal arrest. Only a short period of time elapsed between the stop and the arrest. At no point during that interval was respondent informed that his detention would not be temporary. Although Trooper Williams apparently decided as soon as respondent stepped out of his car that respondent would be taken into custody and charged with a traffic offense, Williams never communicated his intention to respondent. A policeman's unarticulated plan has no bearing on the question whether a suspect was "in custody" at a particular time; the only relevant inquiry is how a reasonable man in the subject's position would have understood his situation. Nor do other aspects of the interaction of Williams and respondent support the contention that respondent was exposed to "custodial interrogation" at the scene of the stop. From aught that appears in the stipulation of facts, a single police officer asked respondent a modest number of questions and requested him to perform a simple balancing
 
 *535
 
 test at a location visible to passing motorists. Treatment of this sort cannot fairly be characterized as the functional equivalent of formal arrest.
 

 Id.
 

 at 441-42
 
 ,
 
 104 S. Ct. at 3151
 
 ,
 
 82 L.Ed.2d at 335-36
 
 .
 
 See also
 

 State v. Rooks
 
 ,
 
 196 N.C.App. 147
 
 , 153,
 
 674 S.E.2d 738
 
 , 742 (2009)
 

 *459
 
 ("The fact that defendant held his head down, was not talkative, and was acting like he was in trouble might suggest he did not feel free to leave. However, the defendant's subjective belief has no bearing here. To hold otherwise would defeat the objective reasonable person standard. These facts and circumstances do not support a conclusion that defendant was subjected to custodial interrogation." (Citations and quotation marks omitted));
 
 State v. Benjamin
 
 ,
 
 124 N.C.App. 734
 
 , 738,
 
 478 S.E.2d 651
 
 , 653 (1996) ("[T]he fact that a defendant is not free to leave does not necessarily constitute custody for purposes of
 
 Miranda
 
 ." (Citations and quotation marks omitted)).
 

 As defendant was not under formal arrest at the time Detective Hill questioned him, we must determine whether, under the totality of the circumstances, defendant's movement was restrained to the degree associated with formal arrest.
 
 Portillo
 
 , --- N.C. App. at ----,
 
 787 S.E.2d at 828
 
 . "For purposes of
 
 Miranda
 
 , custody analysis must be holistic and contextual in nature: it is based on the totality of the circumstances and is necessarily dependent upon the unique facts surrounding each incriminating statement. No one factor is determinative."
 

 Id.
 

 at ----,
 
 787 S.E.2d at 828
 
 (citations and quotation marks omitted).
 
 See also
 

 State v. Crudup
 
 ,
 
 157 N.C.App. 657
 
 , 660-61,
 
 580 S.E.2d 21
 
 , 24-25 (2003) ("
 
 Miranda
 
 warnings are not required during normal investigative activities conducted prior to arrest, detention, or charge. In determining whether specific questions constitute custodial interrogation or general on-the-scene questioning, this Court has found the following factors to be relevant: (1) the nature of the interrogator; (2) the time and place of the interrogation; (3) the degree to which suspicion had been focused on the defendant, (4) the nature of the interrogation and (5) the extent to which defendant was restrained or free to leave. While none of the factors standing alone is determinative, each factor is relevant." (Citations omitted)).
 

 Decided on a case-by-case basis, prior decisions of this Court indicate that the "functional equivalent" standard is quite onerous and not easily met, though it very much depends on the facts of a particular situation.
 
 See, e.g.
 
 ,
 
 State v. Barnes
 
 , --- N.C. App. ----, ----,
 
 789 S.E.2d 488
 
 , 491,
 
 appeal dismissed
 
 ,
 
 369 N.C. 190
 
 ,
 
 794 S.E.2d 525
 
 (2016) ("Based on the totality of the circumstances, including the fact that Defendant was on
 
 *536
 
 probation during the search of Mr. Lewis' residence, we conclude that Defendant was not subjected to a formal arrest or a restraint on his freedom of movement of the degree associated with formal arrest [even though handcuffed during search of the residence]. Therefore, we agree with the trial court that Defendant was not 'in custody' for purposes of
 
 Miranda
 
 .");
 
 Portillo
 
 , --- N.C. App. at ----,
 
 787 S.E.2d at 830
 
 ("Whatever degree of suspicion the detectives may have conveyed through their questioning [of defendant in hospital after surgery for gunshot wounds ], a reasonable person in defendant's position would not have been justified in believing he was the subject of a formal arrest or was restrained in his movement by police action.").
 
 Cf.
 

 State v. Johnston
 
 ,
 
 154 N.C.App. 500
 
 , 503,
 
 572 S.E.2d 438
 
 , 441 (2002) ("After a careful review of the record, we conclude, as a matter of law, that defendant was in 'custody.' The record reveals that defendant was ordered out of his vehicle at gun point, handcuffed, placed in the back of a patrol car, and questioned by detectives. Although the officers informed defendant that he was in 'secure custody' rather than under arrest, we conclude that defendant's freedom of movement was restrained to the degree associated with a formal arrest. A reasonable person under these circumstances would believe that he was under arrest.").
 

 Under the totality of the circumstances in this case, we agree with the trial court's conclusion that defendant "falls short of the test for custody," as he was not formally arrested and an objectively reasonable person in his position would not have felt that his movement was restrained to the degree associated with a formal arrest.
 
 Portillo
 
 , --- N.C. App. at ----,
 
 787 S.E.2d at 828
 
 . While defendant may not have felt free to leave-and in fact may not have been free to leave-the test for custody in relation to
 
 Miranda
 
 is not subjective.
 
 See, e.g.,
 

 State v. Clark
 
 ,
 
 211 N.C.App. 60
 
 , 68,
 
 714 S.E.2d 754
 
 , 760 (2011) ("The extent to which Defendant
 
 *460
 
 was in custody for
 
 Miranda
 
 purposes depends on the objective circumstances surrounding his interactions with law enforcement officers, not on the subjective views harbored by Defendant." (Citation, quotation marks, ellipses, and brackets omitted)). Here, defendant was standing outside of his own vehicle while speaking with Detective Hill; he was not told he was under arrest or handcuffed, and other than his license being retained, his movement was not stopped or limited further while standing outside of the hotel by his vehicle. No mention of any possible suspicion of defendant's involvement in criminal activity-driving while intoxicated or otherwise-had yet been made, and an objectively reasonable person in these circumstances would not have believed he was under arrest or a functional equivalent at that time. Thus, although one of the trial court's findings was in error and not supported by the evidence, there
 
 *537
 
 were still sufficient findings to support the trial court's conclusion of law that defendant was not "in custody" and subject to
 
 Miranda
 
 warnings at the time of his admission. Accordingly, we find no error.
 

 II. Motion to Suppress Blood Test Evidence
 

 Next, defendant argues that the trial court erred in denying his motion to suppress the blood test evidence because Detective Hill obtained a warrantless blood draw outside of exigent circumstances. As stated above, our review of a denial of a motion to suppress is based on "whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law."
 
 Biber
 
 ,
 
 365 N.C. at 167-68
 
 ,
 
 712 S.E.2d at 878
 
 .
 

 Under
 
 N.C. Gen. Stat. § 20-139.1
 
 (d1) (2015):
 

 If a person refuses to submit to any test or tests pursuant to this section, any law enforcement officer with probable cause may, without a court order, compel the person to provide blood or urine samples for analysis if the officer reasonably believes that the delay necessary to obtain a court order, under the circumstances, would result in the dissipation of the percentage of alcohol in the person's blood or urine.
 

 "A reasonable belief generally must be based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officer in believing the point at issue."
 
 State v. Fletcher
 
 ,
 
 202 N.C.App. 107
 
 , 110,
 
 688 S.E.2d 94
 
 , 96 (2010) (citation and quotation marks omitted).
 

 In relation to the blood draw in this case, the trial court made the following relevant findings:
 

 3. Detective Hill testified that when he arrived, the defendant was located in the driver's seat of his vehicle, the defendant had a strong odor of alcohol about his person, and the defendant admitted to driving.
 

 4. Detective Hill testified that defendant "showed some signs of impairment" on the SFSTs and submitted a .10 reading on the roadside PBT.
 

 5. Detective Hill testified that defendant admitted to having a couple of drinks, stated he had not drank
 
 *538
 
 since arriving at the hotel, and stated that he had driven from Salisbury.
 

 6. The defendant was arrested at 2:48 a.m.
 

 7. Detective Hill arrived at the Kannapolis Police Department at 3:06 a.m. The defendant refused the intox within 2 to 3 minutes after arriving at the police department.
 

 8. Detective Hill decided to get a blood test after the defendant refused the intox. CMC Kannapolis is approximately 4 miles away and is the closest place from Kannapolis Police Department for a blood draw.
 

 9. At CMC Kannapolis, Detective Hill read the defendant his rights regarding the blood draw at 3:24 a.m. The defendant made a phone call. Detective Hill waited 30 minutes before starting the blood draw. The defendant refused the blood draw at 3:55 a.m. The defendant was compelled to submit shortly thereafter.
 

 10. CMC Kannapolis is approximately 8 miles from the Magistrate's Office.
 

 *461
 
 11. Detective Hill testified that based on the totality of the information he had at the time, he thought the defendant was close to a .08.
 

 12. Detective Hill testified that it takes approximately 15 minutes to perform a blood draw.
 

 13. Detective Hill testified that he believed it would have taken [an] additional hour to an hour and a half to get a search warrant, which would include driving to and from the Magistrate's Office, filling out the search warrant, presenting the information to the magistrate, and waiting for the warrant to be issued. Detective Hill further indicated that his best estimate of delay would have been an hour and 20 minutes, but it could be longer if there were other officers ahead of him.
 

 14. Detective Hill testified there typically would be one magistrate at that time. There was no information offered if there would have been other officers available to assist in holding the defendant if Detective Hill went to get a search warrant.
 

 *539
 
 15. Based on the information before the court, Detective Hill was the only officer on the scene that night.
 

 16. Detective Hill did not contact the Magistrate's Office to determine if there would have been a wait if he applied for a search warrant.
 

 17. The Court finds Detective Hill's testimony credible.
 

 The trial court concluded in relevant part:
 

 8. There were exigent circumstances to support a warrantless blood draw.
 

 9. In the present case, without getting a warrant, the process for getting the defendant's blood took approximately one hour and 22 minutes from the time the officer made contact with the defendant, 2:33 a.m., until the blood draw began, shortly after 3:55 a.m. There was no evidence before the court that the time this took was anything but routine and was within the officer's expectations.
 

 10. The officer testified that it would take an additional hour to an hour and a half to obtain a search warrant under the circumstances of this case. His testimony was credible. When added to the reasonable and predictable time it took to draw the blood without a warrant, an hour and 22 minutes, the time it would have taken with a warrant increases to two hours and 22 minutes to two hours and 52 minutes.
 

 11. The officer in this case had a .10 roadside reading and alcohol "decreases by approximately 0.015 percent to 0.02 percent per hour once the alcohol has been fully absorbed."
 
 McNeely
 
 . After considering these facts as well as the other factors outlined above, the court finds that the officer had exigent circumstances to have the blood drawn without a warrant. This is also consistent with the two to three hour window found in
 
 State v. Fletcher
 
 to dispense with the need for a warrant as this case falls in the two hour and 22 minutes to two hours and 52 minutes range with the facts listed above.
 

 *540
 
 12. Under the totality of the above referenced circumstances, the defendant's motion to suppress should be denied.
 

 As defendant does not challenge any particular findings on appeal, the trial court's findings are considered binding on appeal.
 
 Biber
 
 ,
 
 365 N.C. at 168
 
 ,
 
 712 S.E.2d at 878
 
 ("[W]hen, as here, the trial court's findings of fact are not challenged on appeal, they are deemed to be supported by competent evidence and are binding on appeal."). Rather, defendant argues that the trial court erred in denying his suppression motion because Detective Hill compelled that his blood be drawn without sufficient exigent circumstances to support the warrantless blood draw.
 

 The United States Supreme Court held in
 
 Schmerber v. California
 
 ,
 
 384 U.S. 757
 
 , 768,
 
 86 S.Ct. 1826
 
 , 1834,
 
 16 L.Ed.2d 908
 
 , 918 (1966) that the Fourth Amendment prohibits the warrantless seizure of a blood sample where such intrusion is "not justified in the circumstances" or is made in an "improper manner." More recently, in
 
 Missouri v. McNeely
 
 ,
 
 569 U.S. 141
 
 ,
 
 133 S.Ct. 1552
 
 , 1568,
 
 185 L.Ed.2d 696
 
 , 715 (2013)
 

 *462
 
 , the Supreme Court held, in the context of a blood draw performed over a defendant's objection in impaired driving cases, that the dissipation of alcohol in a person's blood stream standing alone "does not constitute an exigency in every case sufficient to justify conducting a blood test without a warrant."
 

 This Court addressed
 
 McNeely
 
 in
 
 State v. Dahlquist
 
 ,
 
 231 N.C.App. 100
 
 , 103,
 
 752 S.E.2d 665
 
 , 667 (2013),
 
 appeal dismissed and disc. review denied
 
 ,
 
 367 N.C. 331
 
 ,
 
 755 S.E.2d 614
 
 (2014), noting that "after the Supreme Court's decision in
 
 McNeely
 
 , the question for this Court remains whether, considering the totality of the circumstances, the facts of this case gave rise to an exigency sufficient to justify a warrantless search." In
 
 Dahlquist
 
 , the trial court found that: (1) the defendant pulled up to a checkpoint and an officer noticed an odor of alcohol; (2) the defendant admitted to drinking five beers; (3) field sobriety tests indicated that the defendant was impaired; and (4) the officer went to the hospital directly because he knew that it was 10 to 15 minutes away and typically not too busy on Saturday mornings, but that on a weekend night "it would take between four and five hours to obtain a blood sample if he first had to travel to the Intake Center at the jail to obtain a warrant."
 
 Id
 
 . at 103,
 
 752 S.E.2d at 665
 
 . This Court evaluated the totality of the circumstances and held that "the facts of this case gave rise to an exigency sufficient to justify a warrantless search."
 
 Id
 
 . at 104,
 
 752 S.E.2d at 668
 
 .
 

 In
 
 Fletcher
 
 , decided prior to
 
 McNeely
 
 and
 
 Dahlquist
 
 , this Court held "that competent evidence supports the findings of fact that Officer
 
 *541
 
 Powers reasonably believed that a delay would result in the dissipation of the alcohol in defendant's blood and that exigent circumstances existed that allowed a warrantless blood draw."
 
 Fletcher
 
 ,
 
 202 N.C.App. at 113
 
 ,
 
 688 S.E.2d at 98
 
 . This Court explained in
 
 Fletcher
 
 that the defendant
 

 [did] not question whether he had refused to submit to a test or whether probable cause existed in order to compel a blood test. Therefore, the only issue is whether Officer Powers's belief was reasonable under the circumstances. Defendant contends that Officer Powers's belief-that the delay caused by obtaining a court order would result in the dissipation of defendant's percentage of blood alcohol-was unreasonable and not grounded in fact or knowledge. However, competent evidence exists to suggest that her belief was reasonable. Officer Powers testified that the magistrate's office in Carthage was twelve miles away. She also testified that she had been to the magistrate's office on approximately twenty to thirty occasions late on Saturday night or early Sunday morning. She testified that the weekends are often very busy at the magistrate's office and that, of the twenty to thirty weekend nights she had traveled there, she had had to stand in line several of those times. Officer Powers further testified that she frequently had been to the emergency room at the hospital on weekend nights and that most of the time it was busy then. Based upon her four years' experience as a police officer, Officer Powers opined that the entire process of driving to the magistrate's office, standing in line, filling out the required forms, returning to the hospital, and having defendant's blood drawn would have taken anywhere from two to three hours. Although other evidence exists that could have supported a contrary finding, we hold that the trial court's finding of fact as to Officer Powers's reasonable belief is supported by competent evidence.
 

 Id
 
 . at 110-11,
 
 688 S.E.2d at 96
 
 (quotation marks and brackets omitted). In addition, this Court held that "the trial court had before it competent evidence to support its finding that exigent circumstances existed" where the defendant "had failed multiple field sobriety tests and was unsuccessful at producing a valid breath sample[,]" and the officer "testified as to the distance between the police station and the magistrate's office, her belief that the magistrate's office would be busy late on a Saturday night, and her previous experience with both the
 
 *542
 
 magistrate's office and the hospital on weekend nights."
 
 Id
 
 . at 111,
 
 688 S.E.2d at 97
 
 .
 

 More recently, in
 
 State v. Granger
 
 ,
 
 235 N.C.App. 157
 
 , 165,
 
 761 S.E.2d 923
 
 , 928 (2014)
 

 *463
 
 , this Court affirmed the trial court's denial of a motion to suppress where "the totality of the circumstances showed that exigent circumstances justified the warrantless blood draw." (Emphasis omitted).
 

 Specifically, the trial court found that Officer Lippert had concerns regarding the dissipation of alcohol from Defendant's blood, as it had been over an hour since the accident when Officer Lippert established sufficient probable cause to make his request for Defendant's blood. Those findings also state Officer Lippert's concerns due to delays from the warrant application process. Its findings show that Officer Lippert did not have the opportunity to investigate the matter adequately until he arrived at the hospital because of Defendant's injuries and need for medical care. Even if he had the opportunity to investigate the matter at the accident scene sufficiently to establish probable cause, unlike [the situation in
 
 McNeely
 
 ], Officer Lippert was investigating the matter by himself and would have had to call and wait for another officer to arrive before he could travel to the magistrate to obtain a search warrant. Its findings show that Officer Lippert's knowledge of the approximate probable wait time and time needed to travel, as being over a 40 minute round trip to the magistrate at the county jail. Additionally, Officer Lippert had the added concern of the administration of pain medication to Defendant. Defendant had been in an accident severe enough that he was placed on a backboard for transportation to the hospital and complained of pain in several parts of his body. There was a reasonable chance if Officer Lippert left him unattended to get a search warrant or waited any longer for the blood draw, Defendant would have been administered pain medication by hospital staff as part of his treatment, contaminating his blood sample.
 

 Id.
 

 (citations, quotation marks, brackets, and footnote omitted).
 
 Cf.
 

 State v. Romano
 
 , --- N.C. App. ----, ----,
 
 785 S.E.2d 168
 
 , 174,
 
 temp. stay allowed
 
 ,
 
 369 N.C. 37
 
 ,
 
 789 S.E.2d 438
 
 ,
 
 disc. review allowed
 
 ,
 
 369 N.C. 37
 
 ,
 
 794 S.E.2d 315
 
 , and
 
 369 N.C. 37
 
 ,
 
 794 S.E.2d 317
 
 (2016) ("Under the totality of the circumstances, considering the alleged exigencies of the
 
 *543
 
 situation [where the defendant was unconscious and unable to receive and consider his blood test rights and magistrate's office was a couple miles away from the hospital], the warrantless blood draw was not objectively reasonable.")
 
 [2]
 
 .
 

 The United States Supreme Court addressed warrantless breath tests and blood draws even more recently in
 
 Birchfield v. North Dakota
 
 , --- U.S. ----,
 
 136 S.Ct. 2160
 
 ,
 
 195 L.Ed.2d 560
 
 (2016). In
 
 Birchfield
 
 , the Supreme Court held that a warrantless breath test of an impaired-driving suspect is permissible under the Fourth Amendment as a search incident to arrest, but a warrantless blood draw is not permissible as a search incident to arrest due to its nature of being a greater intrusion of privacy.
 

 Id.
 

 at ----,
 
 136 S.Ct. at 2185
 
 ,
 
 195 L.Ed.2d at 588
 
 ("Because breath tests are significantly less intrusive than blood tests and in most cases amply serve law enforcement interests, we conclude that a breath test, but not a blood test, may be administered as a search incident to a lawful arrest for drunk driving.").
 

 Here, however, defendant's only argument on appeal in relation to the blood draw is that it was "outside of exigent circumstances[,]" so
 
 Birchfield
 
 does not change the analysis.
 
 See
 

 id
 
 . at ----,
 
 136 S.Ct. at 2184
 
 ,
 
 195 L.Ed.2d at 587
 
 ("Nothing prevents the police from seeking a warrant for a blood test when there is sufficient time to do so in the particular circumstances or from relying on the exigent circumstances exception to the warrant requirement when there is not."). Furthermore, under the totality of the circumstances in this case, "the evidence supports the trial court's findings and conclusions regarding the existence of exigent circumstances[.]"
 
 Dahlquist
 
 ,
 
 231 N.C.App. at 104
 
 ,
 
 752 S.E.2d at 668
 
 .
 

 Defendant submitted a .10 reading on a roadside PBT and was subsequently arrested at 2:48 a.m. before being transported to the Kannapolis Police Department, where he arrived
 
 *464
 
 18 minutes later. Defendant "refused the intox within 2 to 3 minutes after arriving at the police department[,]" so Detective Hill made the decision to compel a blood test. The closest hospital was approximately four miles away from the police department and eight miles away from the Magistrate's Office. Detective Hill read defendant his rights as related to the blood draw at the hospital at 3:24 a.m. and waited for defendant to finish making a phone call before starting the blood draw at 3:55 a.m. The trial court
 
 *544
 
 also found that "Detective Hill testified that based on the totality of the information he had at the time, he thought the defendant was close to a .08." Additionally, Detective Hill indicated that it was his belief that it would have taken an additional hour to an hour and a half to get a search warrant and he was the only officer on the scene, as in
 
 Granger
 
 , where the officer "was investigating the matter by himself and would have had to call and wait for another officer to arrive before he could travel to the magistrate to obtain a search warrant."
 
 Granger
 
 ,
 
 235 N.C.App. at 165
 
 ,
 
 761 S.E.2d at 928
 
 .
 

 As in
 
 Fletcher
 
 , "[a]lthough other evidence exists that could have supported a contrary finding,"
 
 202 N.C.App. at 111
 
 ,
 
 688 S.E.2d at 96
 
 , we conclude that the trial court's findings-as to Detective Hill's reasonable belief that a delay would result in the dissipation of the alcohol in defendant's blood-are supported by competent evidence. As the findings are supported by competent evidence, and the findings support the trial court's ultimate conclusion that the blood draw was constitutional, we hold that the trial court did not err in denying defendant's motion to suppress the blood draw.
 

 III. Motion to Dismiss
 

 Finally, defendant argues that the trial court erred in denying his motion to dismiss the impaired driving charge at the close of the State's evidence and at the close of all evidence because the State failed to present substantial independent circumstantial or direct evidence-other than defendant's statement-to establish that defendant was operating a motor vehicle at any relevant time.
 

 This Court reviews the trial court's denial of a motion to dismiss
 
 de novo
 
 . Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. In making its determination, the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor.
 

 *545
 

 State v. Marley
 
 ,
 
 227 N.C.App. 613
 
 , 614-15,
 
 742 S.E.2d 634
 
 , 635-36 (2013) (citations and quotation marks omitted).
 
 See also
 

 State v. Scott
 
 ,
 
 356 N.C. 591
 
 , 597,
 
 573 S.E.2d 866
 
 , 869 (2002) ("Substantial evidence is that amount of relevant evidence necessary to persuade a rational juror to accept a conclusion.");
 
 State v. Franklin
 
 ,
 
 327 N.C. 162
 
 , 171-72,
 
 393 S.E.2d 781
 
 , 787 (1990) ("The trial court need only satisfy itself that the evidence is sufficient to take the case to the jury; it need not be concerned with the weight of that evidence. If there is any evidence tending to prove guilt or which reasonably leads to this conclusion as a fairly logical and legitimate deduction, it is for the jury to say whether it is convinced beyond a reasonable doubt of defendant's guilt." (Citations omitted)).
 

 Under
 
 N.C. Gen. Stat. § 20-138.1
 
 (2015), a person commits the crime of driving while impaired
 

 if he drives any vehicle upon any highway, any street, or any public vehicular area within the State:
 

 (1) While under the influence of an impairing substance; or
 

 (2) After having consumed sufficient alcohol that he has, at any relevant time after the driving, an alcohol concentration of 0.08 or more. The results of a chemical analysis shall be deemed sufficient evidence to prove a person's alcohol concentration; or
 
 *465
 
 (3) With any amount of a Schedule I controlled substance, as listed in G.S. 90-89, or its metabolites in his blood or urine.
 

 N.C. Gen. Stat. Ann. § 20-138.1
 
 (a). Here, defendant argues that "the [S]tate has failed to present evidence of the substantial elements of 'driving' and 'on a highway, street, or public vehicular area' for the charged offense of driving while impaired."
 

 This Court has previously found that "one 'drives' within the meaning of [
 
 N.C. Gen. Stat. § 20-138.1
 
 ] if he is in actual physical control of a vehicle which is in motion or which has the engine running."
 
 State v. Fields
 
 ,
 
 77 N.C.App. 404
 
 , 406,
 
 335 S.E.2d 69
 
 , 70 (1985). In this case, defendant admitted to Detective Hill that he had been driving the vehicle, and as discussed above, his statement was admissible evidence. He also described in detail the route he took to get to the hotel. Defendant told Detective Hill that he had driven from Salisbury on Interstate 85. Specifically, Detective Hill explained:
 

 *546
 
 Then I asked if he got off the exit on the Interstate at Highway 29. We were close to Exit 58 off 85. I asked if he got off at that Exit, and he said yes. And then he pointed to the IHOP, which is at the intersection of 29 and Cloverleaf Plaza. When I asked him where he turned, he pointed there. And then I pointed to Cloverleaf Parkway, which is the road/street running right in front of the hotel, asked if he drove down that portion of the road and he said yes.
 

 Although Detective Hill testified that the vehicle's engine was not running at the time he approached the vehicle, it was parked under the overhang area by the front door of the hotel, where guests typically stop to check in to the hotel, not in a parking spot. He also observed defendant sitting in the driver's seat, and defendant got out of the driver's seat to give Detective Hill his driver's license. The vehicle was registered to defendant. The circumstantial evidence, along with defendant's admissions to driving the vehicle and the route he took, was sufficient evidence for the jury to decide whether defendant drove the vehicle and whether he drove it on a highway, street, or public vehicular area at a relevant time. Thus, "[u]nder the proper standard of review, substantial evidence existed for each essential element of DWI. Viewing the evidence in a light most favorable to the State, we conclude that a reasonable inference of defendant's guilt may be drawn from the direct and circumstantial evidence presented by the State. Such evidence was sufficient to support the jury's verdict of guilty."
 
 Scott
 
 ,
 
 356 N.C. at 598
 
 ,
 
 573 S.E.2d at 870
 
 .
 

 Conclusion
 

 Accordingly, we hold that the trial court did not err by denying defendant's motions to suppress his statement, by denying his motion to suppress the results of the warrantless blood test, or by denying his motion to dismiss for insufficient evidence.
 

 NO ERROR.
 

 Chief Judge McGEE and Judge INMAN concur.
 

 [1]
 

 Detective Hill did not say what the clerk told him, if anything, regarding the specifics of any "actions" of defendant or the woman which aroused his suspicions of a potential robbery. As relevant to the issues in this case, there is no evidence that the hotel clerk reported anything about when the Explorer arrived at the hotel or who had been driving it.
 

 [2]
 

 Our Supreme Court granted a temporary stay in this matter on 24 May 2016,
 
 State v. Romano
 
 ,
 
 369 N.C. 37
 
 ,
 
 789 S.E.2d 438
 
 (2016), and recently heard arguments on 20 March 2017.